# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORID
### ORLANDO DIVISION

## Case No. 6:23-cv-o1887

WOMEN IN STRUGGLE, MELINDA
BUTTERFIELD, CHRISTYNNE WOOD,
BRIANNA KELLY, TSUKURU FORS,
LINDSEY SPERO, and ANAÏS KOCHAN,

       *Plaintiffs*,

v.

ANDREW BAIN, ERIC SMITH, KEVIN
EDMONDS, DAVID DUNN, SPENCER
TONG, KORY KEITH, JOHN W. MINA,
JARED PERDUE, JOHN TYLER,
THOMAS DRAPER, and ALEX MARTINS,

       *Defendants.*

**Challenge to the
Constitutionality of Florida
Statute § 553.865 (2023)**

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Women in Struggle, Melinda Butterfield, Christynne Wood, Brianna Kelly, Tsukuru Fors, Lindsey Spero, and Anaïs Kochan, by and through their undersigned counsel, bring this lawsuit against Defendants Andrew Bain, Eric Smith, Kevin Edmonds, David Dunn, Spencer Tong, Kory Keith, John W. Mina, Jared Perdue, John Tyler, Thomas Draper, and Alex Martins (collectively "Defendants") to challenge Florida Statute § 553.865 (2023) ("Fla. Stat. § 553.865") and to seek declaratory and injunctive relief.

### INTRODUCTION

1.    Plaintiffs challenge Fla. Stat. § 553.865, known as the Bathroom Ban,

which charges with trespass anyone who uses public restrooms or changing facilities that differ from their reproductive anatomy present at birth and who refuses to leave when asked to do so. Fla. Stat. § 553.865 defines men as people with reproductive anatomy that produces sperm. It defines women as people with reproductive anatomy that produces eggs. And it presumes that no one outgrows these categories, or exists outside of them.

2.     This view of sex and gender causes irreparable harm for transgender, gender nonconforming, and certain intersex people (TGNCI people) because this community's identities may differ from their sex assigned at birth. When TGNCI people walk, talk, dress, or use an affirming restroom, they communicate their gender identity in a way that society can understand. Fla. Stat. § 553.865 would ban this conduct and perspective and force TGNCI people to adopt the state's view of sex and gender instead.

3.     Plaintiffs are TGNCI participants who will march alongside an estimated 1,000 people in Orlando, Florida on October 7, 2023 to protest this erasure. Plaintiffs have sincere concerns about their ability to exercise their protest and expressive conduct rights as they traverse the state of Florida from October 2 through October 8, 2023. Some Plaintiffs plan to use a restroom that aligns with their gender, which exposes them to arrest. Others wish to avoid that risk and plan to use non-affirming restrooms. Some will forgo multi-stall public restrooms altogether due to fear and discomfort.

4.     All of these outcomes are unacceptable. At the root of each one is an

acknowledgment that TGNCI people cannot urinate—or exist—like other people. The state cannot erase an entire community and threaten its members with criminal prosecution for lawful expression and assembly. Plaintiffs can demonstrate Fla. Stat. § 553.865 is unconstitutional and that it will burden their speech rights and cause irreparable harm so long as it remains in effect. Plaintiffs ask this Court to declare Fla. Stat. § 553.865 unconstitutional as applied to them and to request a temporary restraining order and hearing prohibiting the Defendants from enforcing this ban.

## JURISDICTION/VENUE

5.      This action arises under 42 U.S.C. § 1983.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and because this action seeks to secure equitable or other relief for the violation of the Plaintiffs' civil rights.

7.      This Court also has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367 over claims arising under Florida state law and the Florida State Constitution.

8.      This Court has the authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57. This Court has the authority to grant injunctive relief inclusive of a temporary restraining order pursuant to Federal Rule of Civil Procedure 65.

9.      Venue is proper in this District and Division under 28 U.S.C. §

1391(b). The Defendants are sued in their official capacities. Each Defendant resides in the State of Florida, and at least one Defendant resides within this District and Division.

## THE PARTIES

*PLAINTIFFS*

10.    Women in Struggle is a collective dedicated to the empowerment and advancement of all women. Through its eight branches in the United States, Women in Struggle works to raise awareness around abortion rights and helps facilitate self-defense classes. In the beginning of 2023, Women in Struggle agreed to divert its resources to transgender-inclusive movements, including this march, as statehouses around the country legislated against TGNCI communities. Its members have traveled to Washington, D.C. and San Francisco and spoken with media to promote the march; attended several months of meetings regarding march logistics; and some plan to travel to Orlando several days in advance to help organize and safely accompany TGNCI members and participants to affirming restrooms.

11.    Melinda Butterfield (she/her) is a 52-year-old transgender woman who is traveling from her home in Brooklyn, New York to Orlando to attend the October 7 protest, arriving several days in advance to help organize protest activities. Ms. Butterfield is an organizer with Women in Struggle, one of the many groups participating in the march. Since Ms. Butterfield came out as transgender, she has amended her driver's license, her passport, and her passport card to reflect

her legal sex as a woman. During her time in Orlando, she will naturally need to use restroom facilities, including ones covered by Fla. Stat. § 553.865. She plans to use the women's restroom—thereby violating the law—or hold her urine if the circumstances are not safe to relieve herself. To use the men's room would force Ms. Butterfield to accept an idea about her gender that she sincerely disagrees with.

12.     Tsukuru Fors (he/they) is a 52-year-old non-binary, masculine person who is traveling to Orlando from his home in West Hollywood, California to attend the October 7 protest, arriving several days in advance to help organize protest activities. Mr. Fors previously worked as a business consultant and devotes much of his time to activism. Since he came out, Mr. Fors has changed his gender marker on his state California ID to "X" to indicate his non-binary identity. During his time in Orlando, Mr. Fors will naturally need to use restroom facilities, including ones covered by Fla. Stat. § 553.865. He plans to use the women's restroom because he does not want to risk prosecution under Fla. Stat. § 553.865. Being coerced into the women's restroom will not make Mr. Fors safer, as he has a deep voice and a masculine presentation and fears having security called on him.

13.     Brianna Kelly (she/her) is a 41-year-old transgender woman who is traveling to Orlando from her home in San Diego, California to attend the October 7 protest, arriving several days in advance to help organize protest activities. Ms. Kelly is a trained emergency management technician. Since coming out as transgender, Ms. Kelly has amended her California birth certificate, driver's license, and U.S. passport to reflect her legal sex as a woman. Ms. Kelly has also

5

received gender confirmation surgery in the form of a vaginoplasty. During her time in Orlando, Ms. Kelly will naturally need to use restroom facilities, including ones covered by Fla. Stat. § 553.865. She plans to use the women's restroom—thereby violating the law—because she has the same anatomy as any cisgender woman and would feel unsafe, invalidated, and coerced into having the outside world perceive her as a man if forced into the men's restroom.

14.    Anaïs Kochan (she/her) is a 52-year-old transgender woman who is traveling to Orlando from her home in Boston, Massachusetts to attend the October 7 protest, arriving several days in advance to help organize protest activities. Ms. Kochan works as a case manager for a commercial litigation firm. After she came out as transgender, Ms. Kochan changed her legal sex and her name on all of her identity documents, including her driver's license, social security card, and U.S. passport. During her time in Orlando, Ms. Kochan will naturally need to use restroom facilities, including ones covered by Fla. Stat. § 553.865. She plans to use the women's restroom—thereby violating the law—but if the circumstances are unsafe, or if she cannot find someone to go to the women's restroom with her, she will hold her pee out of fear or use a unisex restroom. When she is forced to use a unisex restroom when there is a perfectly good women's restroom nearby, Ms. Kochan feels humiliated, othered, and inconvenienced.

15.    Lindsey Spero (they/he) is a 26-year-old non-binary masculine person who is driving to Orlando from their home in Pinellas County to attend the October 7 protest. Spero, who does not prefer any gendered title, recently worked

as an advocate for TGNCI youth who wanted to access gender-affirming care. Since coming out as transgender, Spero has amended the gender marker on their driver's license in Florida to reflect their more masculine identity. Spero avoids using public restrooms as frequently as possible because of the hostility in Florida toward TGNCI people. Spero experiences housing insecurity, so if they cannot make it to a friends' house, they either hold their bladder, which increases their risk of a urinary tract infection, or they relieve themselves outside. Neither option is safe, but both are better than using a non-affirming restroom and being forced to embrace the gender that the state wants Spero to be.

16.    Christynne Wood (she/her) is a retired 67-year-old transgender woman who is traveling to Orlando from her home of Lakeside, California to attend the October 7 protest, arriving several days in advance to help organize protest activities. Since coming out as transgender, Ms. Wood has amended her driver's license, her passport, and her passport card to reflect her legal sex as a woman. Ms. Wood also received gender confirmation surgery in the form of a vaginoplasty. During her time in Orlando, Ms. Wood will naturally need to use restroom facilities, including ones covered by Fla. Stat. § 553.865. She plans to use the women's restroom—thereby violating the law and subjecting herself to arrest—because she has the same anatomy as any cisgender woman. In Ms. Woods' words, people should not blindly follow unjust laws.

*DEFENDANTS*

17.    **Andrew Bain** is the State Attorney for the 9th Judicial Circuit in

Florida, which includes Orlando. Governor Ron DeSantis appointed Defendant Bain last month to replace Monique Worrell, who DeSantis removed, in part, because Ms. Worrell signed a statement pledging not to prosecute people accused of transgender-related crimes. Bain must "prosecute or defend on behalf of the state all suits, applications, or motions, civil or criminal, in which the state is a party," Florida Statute § 27.02 (1), including the Bathroom Ban. Bain oversees assistant state attorneys who enforce these laws and employs investigators who have "full powers of arrest" to "arrest any person for violation of state law or applicable county or city ordinances when such violation occurs within the boundaries of the judicial circuit." Fla. Stat. § 27.255 (1). Plaintiffs will be violating the law within Bain's jurisdiction. Bain is the head of a state agency with authority to enforce violations of Fla. Stat. § 553.865. He also serves at the pleasure of Governor Ron DeSantis. He is sued in his official capacity.

18.    **Eric D. Smith** is the Police Chief of the Orlando Police Department and was appointed in August 2022. Smith exercises "general superintendence over the police force" and is "responsible for the good order of the same." Code of the City of Orlando, Florida [hereinafter "Orlando City Code"] § 48.01. Smith's officers are empowered to enforce "the penal ordinances of the City and Orange County and the state statutes, exercise arrest powers as authorized by state statutes, and exercise such other powers as provided by law." Orlando City Code § 48.03. Smith oversees officers who would arrest Plaintiffs for violating Fla. Stat. § 553.865 when they use restrooms in public buildings in the City of Orlando, including, upon

information and belief, Orlando City Hall. Smith is the head of a local agency with authority to enforce violations of Fla. Stat. § 553.865. He is sued in his official capacity.

19. **Kevin Edmonds** is the Chief Administrative Officer of the City of Orlando whose duties include "the general supervision and direction of the operation and administration of all departments, offices and bureaus of the City." Orlando City Code § 2.19(1), Art. IV. Upon information and belief, Edmonds oversees the administration and compliance with Fla. Stat. § 553.865 in government buildings such as Orlando City Hall and the Orlando Clerk's Office. Edmonds serves at the pleasure of the Mayor of Orlando. He is sued in his official capacity.

20. **David Dunn** is the City Facilities Manager for the City of Orlando. Upon information and belief, his duties include the daily operations and maintenance of the city facilities, fire department stations, police headquarters and several police substations, and the city's critical facilities. Upon information and belief, these duties include compliance with Fla. Stat. § 553.865 in city-owned facilities such as Orlando City Hall and the Dr. Phillips Center for the Performing Arts. Dunn has authority to enforce Fla. Stat. § 553.865. He is sued in his official capacity.

21. **Spencer Tong** is the Executive Vice President for the Dr. Phillips Center for the Performing Arts, a city-owned building along the march route that is subject to enforcement under Fla. Stat. § 553.865. Mr. Tong's duties include

overseeing daily operations at the performing arts center, including, upon information and belief, legal compliance with Fla. Stat. § 553.865 concerning the use of restroom facilities which he has the authority to enforce. Mr. Tong is sued in his official capacity.

22. **Kory Keith** is the Division Manager of the Orlando Code Enforcement Division. Keith's duty is to ensure "compliance with the codes and ordinances of the City." Orlando City Code § 5.04(1). Keith has a duty to "initiate enforcement proceedings of the various codes and ordinances," which includes the Florida Building Code and Fla. Stat. § 553.865. Orlando City Code § 5.04(3). Keith is the head of a local agency with authority to enforce violations of the Florida Building Code. He is sued in his official capacity.

23. **John W. Mina** is the Sheriff of the Orange County Sheriff's Office in Orlando, Florida. Mina oversees county deputies whose duties include apprehending anyone who "disturb[s] the peace" and instituting legal proceedings against them before "the proper judicial officer," as well as executing warrants, summons, and other service of process. Fla. Stat. § 30.15(1)(b)-(g). Upon information and belief, Mina's deputies are empowered to enforce violations or perceived violations of Fla. Stat. § 553.865. Mina is the head of a local agency with authority to enforce violations of Fla. Stat. § 553.865. He is sued in his official capacity.

24. **Jared Perdue** is the Secretary of Transportation for the State of Florida, and the head of the Florida Department of Transportation ("FDOT"), the

Florida state agency responsible for the operation and maintenance of highway rest stops throughout the state of Florida, including those in the Orlando area. Secretary Perdue's duties include promulgating FDOT departmental policies, rules, procedures, and standards, and ensuring uniform compliance with the laws of Florida at rest stops, including Fla. Stat. § 553.865 concerning the use of restroom facilities, which he has the authority to enforce. Secretary Perdue's offices are headquartered in Tallahassee, Florida. Secretary Perdue serves at the pleasure of Governor Ron DeSantis. He is sued in his official capacity.

25. **John Tyler** is the District Secretary for FDOT District 5, which covers the Central Florida region, including Orlando. District Secretary Tyler's duties include managing and supervising FDOT personnel, overseeing the day-to-day operations of FDOT rest stops in Central Florida, and ensuring that travelers using FDOT rest stops comply with Florida law, including Fla. Stat. § 553.865 concerning the use of restroom facilities, which he has the authority to enforce. He is sued in his official capacity.

26. **Thomas Draper** is the Chief of Operations for the Greater Orlando Aviation Authority ("GOAA"), the municipal governmental agency responsible for the operation of the Orlando International Airport ("MCO") and the Orlando Executive Airport ("ORL"). Mr. Draper's duties include overseeing day-to-day operations at MCO and ORL, managing and supervising security, facilities, and operations personnel at MCO and ORL, and ensuring that passengers traveling through MCO and ORL comply with Florida law, including Fla. Stat. § 553.865

concerning the use of restroom facilities, which he has the authority to enforce. He is sued in his official capacity.

27. **Alex Martins** is the chair of the University of Central Florida Board of Trustees, the government authority with final authority for the post-secondary educational institution's policy decisions, compliance with state laws, resources and personnel, and more. Mr. Martin's duties include overseeing the university's compliance with applicable state laws and regulations, including Fla. Stat. § 553.865 concerning the use of restroom facilities which he has the authority to enforce. He is sued in his official capacity.

## FACTS & RELEVANT PORTIONS OF THE BATHROOM BAN

### *Background on Transgender People, Non-Binary People, Intersex People, and Gender Dysphoria*

28. A person's sex is determined by sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity.

29. These characteristics are not always in alignment.

30. Doctors frequently do not consider all of these characteristics when they assign someone's sex at birth.

31. The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth.

32. Typically, a person is assigned a sex on their birth certificate solely based on the appearance of external reproductive organs at the time of birth.

33.     This method of assigning sex often misses internal biological sex characteristics like gender identity.

34.     Gender identity—a person's core internal sense of their own gender—is the primary factor in determining a person's sex. There is a medical consensus that gender identity is innate.

35.     Transgender individuals are people whose gender identity diverges from the sex they were assigned at birth.

36.      Cisgender individuals are people whose gender identity aligns with the sex they were assigned at birth.

37.     Many, but not all, transgender people suffer from gender dysphoria.

38.     Gender dysphoria is a serious medical condition that appears in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-V").

39.     Gender dysphoria causes severe psychological suffering and can lead to physical injury when it is not properly treated.

40.     Treatment for gender dysphoria includes hormone replacement therapy, affirming name and pronoun changes, and gender-affirming surgeries such as vaginoplasties and phalloplasties.

41.     Some transgender people do not identify as a man or as a woman; these individuals often refer to themselves as non-binary, agender, or gender nonconforming.

42.     These individuals may still suffer from gender dysphoria and seek

hormone replacement treatment even if they do not identify as a man or a woman.

43.   Sometimes transgender and gender nonconforming people are also intersex.

44.   Intersex refers to a person whose reproductive, chromosomal, or sexual anatomy does not neatly align as either "female" or "male."

45.   Doctors frequently operate on intersex babies and children without their consent to "correct" their genitalia to either "female" or "male."

46.    Not all intersex people receive surgery or treatment because not all intersex conditions are noticeable at birth.

47.   Some intersex conditions are genetic and result in changes to one's genitalia later in life during puberty.

### *Fla. Stat. § 553.865 imposes a binary, immutable viewpoint of sex*

48.    Florida lawmakers passed six bills in the 2023 legislative session targeting lesbian, gay, bisexual transgender, queer, and/or intersex ("LGBTQI") people, which was more than in the preceding seven years combined.

49.   One of those bills was Fla. Stat. § 553.865, which Governor Ron DeSantis signed into law on May 17, 2023.

50.    Fla. Stat. § 553.865 makes it criminal trespass for a person to willfully enter a multi-stall restroom or changing facility "designated for the opposite sex" in K-12 buildings, post-secondary education buildings, adult prisons and juvenile detention centers, and refuse to leave upon request. Fla. Stat. § 553.865(7)-(11).

51.    Fla. Stat. § 553.865 also applies to "public buildings," which includes

<u>any</u> building in the state of Florida "owned or leased by the state, a state agency, or a political subdivision." *Id.* at (3)(j).

52.     Fla. Stat. § 553.865 applies to any building in the state of Florida owned or leased by the government with multi-stall restrooms or multi-stall facilities. *Id.* at (3)(c), (j)-(k).

53.     Fla. Stat. § 553.865 segregates these restrooms by sex, which the state defines as "either female or male based on the organization of the body of such person for a specific reproductive role, as indicated by the person's sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth." *Id.* at (3)(l) (emphasis added).

54.     Fla. Stat. § 553.865 states that "[a] 'male' is a person 'belonging, at birth, to the biological sex which has the specific reproductive role of producing sperm.'" *Id.* at (3)(h).

55.     Fla. Stat. § 553.865 states that "[a] 'female' is a person 'belonging, at birth, to the biological sex which has the specific role of producing eggs.'" *Id.* at (3)(g).

56.     Fla. Stat. § 553.865 requires intersex people to either receive treatment or surgery from a physician to avoid prosecution under the law. *Id.* at (15)(a).

57.     Fla. Stat. § 553.865 views sex as immutable, only based on one's binary reproductive birth anatomy, and separate from gender.

58.     This viewpoint excludes all transgender, gender non-conforming, and

certain intersex ("TGNCI") people" from affirming restrooms and changing facilities, regardless of their gender identity, their legal sex as reflected on state ID, and whether they have received medical treatment that has made their bodies and secondary-sex characteristics indistinguishable from those whose "birth" sex is male or female in the eyes of the statute.

59.   This viewpoint forces TGNCI people to use a non-affirming facility and become the bearer of the state's viewpoint, regardless of how much it conflicts with their sincerely held beliefs about their identities.

60.   The legislative history makes clear that transgender people are the target of the bill, even if they were not expressly named.

61.   The bill summary of HB 1521, which was codified as Fla. Stat. § 553.865, specifically discusses transgender people.

62.   Public statements from Florida legislators and elected officials irrefutably demonstrate that Fla. Stat. § 553.865 was designed to target and demean the existence of TGNCI people and exclude them from accessing sex-segregated facilities in accordance with their gender.

63.   These statements are part of a three-year push by Florida legislators and elected officials to remove TGNCI perspectives and TGNCI people from civil society.

64.   Fla. Stat. § 553.865 has been effective since July 1, 2023.

65.   Fla. Stat. § 553.865 is rife for arbitrary enforcement because it lacks clear enforcement guidance.

**Fla. Stat. § 553.865 harms and targets TGNCI individuals such as Plaintiffs**

66.     Because there is no definitive way to "prove" one's sex at birth, the statute authorizes and indeed relies on sex-stereotyping as its primary enforcement mechanism.

67.     The statute permits TGNCI people–and anyone whose gender presentation is perceived to be atypical–to be forcibly evicted from restrooms based on sex and gender stereotypes about what men and women look like, or else to face arrest and criminal prosecution.

68.     Because Fla. Stat. § 553.865 rejects people's legal sex (as reflected on state-issued identity documents) as a means of establishing one's sex for purposes of their restroom use under the statute, it makes it impossible for TGNCI people– or, indeed, any person accused of being in the wrong restroom–to exonerate themselves and escape criminal prosecution without submitting to genital checks or other invasive forms of inspection.

69.      Representative Plakon, the bill sponsor, acknowledged there is a risk that people will be falsely accused and prosecuted under this statute.

70.     Representative Plakon admitted that HB 1521 fails to outline the amount of evidence sufficient to identify who can be prosecuted under Fla. Stat. § 553.865.

71.     Plakon also acknowledged the only way intersex people can avoid persecution under the statute is to carry medical records documenting their

condition or a doctor's note that they can present on request.

72.    State agencies subject to the ban have until July 1, 2024, to pass regulations on how to discipline people who violate Fla. Stat. § 553.865.

73.    The regulations issued to date have not cleared these issues with unclear enforcement standards.

74.    Although the Florida Board of Education voted on Aug. 23 to adopt a proposal that would fire a TGNCI employee for using an affirming restroom or changing facility more than once, the proposal failed to mention *how* to enforce the proposal consistent with Fla. Stat. § 553.865.

75.    Upon information and belief, since July 1, 2023 public buildings owned or leased by the government have been subject to an ongoing duty to enforce Fla. Stat. § 553.865 against TGNCI members of the public, even though its enforcement mechanism is vague and arbitrary.

76.    If covered entities refuse to enforce the ban, they will be subject to penalties and "licensure or regulatory disciplinary action, as applicable." *Id*. at § 553.865(14)(a).

77.    Governor DeSantis has also adopted and implemented an executive policy mandating the enforcement of his slate of anti-TGNCI bills statewide, including Fla. Stat. § 553.865, and removing from office any government officials who express opposing views.

78.    Governor DeSantis has applied his mandatory enforcement policy across the state of Florida, and gone as far as removing state attorneys from office

when they fail to pursue prosecutions that ensure his policy of 100-percent enforcement is realized.

79.     Prominent examples of Governor DeSantis's 100-percent enforcement policy are the recent removals of two state attorneys, including in Orange County where Orlando sits, who pledged not to prosecute TGNCI people accused of seeking gender-affirming treatment in violation of the law.

80.     Upon information and belief, DeSantis's removal policy of removing public officials who exercise discretion to not prosecute alleged violations of Fla. Stat. § 553.865 applies with equal force to Defendants, who are government officials who are charged with enforcing Fla. Stat. § 553.865 and/or prosecuting violators.

81.     Upon information and belief, the Orlando International Airport, Orlando Sanford International Airport, Orlando Executive Airport, and Florida Department of Transportation rest stops, and even many courthouses are public buildings owned or leased by the government and therefore subject to the statute.

82.      Plaintiffs who wish to travel to Florida by air or by car, or to assemble in government leased buildings or properties must either violate the law, hold their urine out of fear, or embrace the state's viewpoint by using a non-affirming restroom.

83.     Since it is impossible for Plaintiffs to know how many countless other buildings in and around Orange County are owned or *leased* by the government absent a government bulletin or extensive public records search, they are liable to

face the risk of prosecution in countless other restrooms.

***Florida lawmakers have coordinated with private anti-TGNCI groups to pass numerous pieces of anti-TGNCI legislation, including Fla. Stat. § 553.865***

84.   For the last three years, Florida lawmakers and government officials have coordinated with private advocacy groups to pursue model legislation and regulatory action that discriminates against TGNCI people, their viewpoints, and their very existence.

85.   Florida lawmakers and government officials have relied on these groups for legislative witnesses, model bills, and more, to frame TGNCI identity as an ideology that society must erase to save women and children.

86.    Throughout this effort, lawmakers have increased the risk of private violence by describing the TGNCI community as groomers who are intent on spreading sexuality and gender ideology and transgender ideology.

87.   Florida lawmakers began this effort in 2020 when Representative Anthony Sabitini requested that individuals and entities with anti-TGNCI viewpoints support an early version of Florida Vulnerable Child Protection Act, which sought to ban gender-affirming treatment for transgender youth.

88.   Although the act failed to pass, the legislative effort established relationships between Florida officials and private anti-TGNCI organizations and individuals that continue to this day.

89.   Those organizations and individuals include the Alliance Defending Freedom, the Catholic Medical Association, the American College of Pediatrics, the

Child & Parental Rights Campaign, Vernadette Broyles, Michelle Cretella, Michael Laidlaw, André van Mol, Quentin L. Van Meter, and others.

90.     The Catholic Medical Association ("CMA") is an organization that has required an absolute commitment from its members to oppose any standard of transition-related care since 2021.

91.     The American College of Pediatrics ("ACP") is an organization that requires its members to recognize heterosexual family units and immutable conceptions of sex and gender as the optimal means for children's health.

92.     The Child & Parental Rights Campaign ("CPRC") is a Georgia law firm whose member, Vernadette Broyles, was involved in the 2020 effort to get Florida to pass a ban on gender-affirming care for minors.

93.     The ACP, CMA, and CPRC have worked closely with lawyers from the Alliance Defending Freedom ("ADF") on anti-TGNCI legislation and advocacy.

94.     The ADF is a conservative Christian legal advocacy group that has introduced model legislation to ban TGNCI from needed healthcare, affirming facilities and identity documents, and sports participation.

95.     The ADF's model legislation often reflects ADF's belief that God created each person "with an immutable biological sex – male or female."[1]

---

[1] *Statement of Faith*, Alliance Defending Freedom, https://adflegal.org/about-us/careers/statement-of-faith.

96.     ADF members have likened TGNCI healthcare to a "eugenics" project[2] and refer to transgender women as "biological males" and transgender men as "biological females."

97.     These views broke ground in Florida in June 2021 when Gov. DeSantis signed the "Fairness in Women's Sports Act" and made clear that its goal was to ban transgender people from playing on girls' sports teams.

98.      This act passed despite co-sponsors acknowledging there being no evidence of issues with transgender girls participating in sports according to their gender identity.

99.     The next month, Gov. DeSantis joined the ADF at their Summit on Religious Liberty.

100.    Come April 2022, the Florida Department of Health issued a misleading report on gender dysphoria, the treatment that many TGNCI people seek, that said "social gender transition should not be a treatment option for children or adolescents."

101.     Florida officials relied on several current and former members of the CMA, including Van Meter, to author this report.

102.    Using this report from CMA and ADF-affiliated authors, the Florida Department of Health directed the Florida Agency for Healthcare Administration to investigate whether gender-affirming care is "experimental."

---

[2] Emilie Kao, *The Transgender Movement's House of Cards Is Falling*, Alliance Defending Freedom (Sept. 6, 2023), https://adflegal.org/article/transgender-movements-house-cards-falling.

103.   This suggestion that gender-affirming care is "experimental" clashes with an overwhelming number of medical associations who have long supported this form of treatment.

104.   This medical consensus did not stop the Florida agency for Healthcare Administration from relying on its biased report to reach its predetermined conclusions that gender-affirming care is experimental.

105.   As Judge Robert L. Hinkle ruled in a separate case, the Florida agency for Healthcare Administration "proposed a rule barring Medicaid payments" for gender-affirming surgeries "based in part on the flawed" investigation. *Dekker v. Weida*, 4:22-cv-00325-RH-MAF (N.D. Fla. 2023), ECF 246, Order, Findings of Fact and Conclusions of Law, at 10.

106.   The agency, in Hinkle's words, "conducted a well-choreographed public hearing that was an effort not to gather facts but to support [this] predetermined outcome." *Id.*

107.   This medical consensus also did it stop Florida lawmakers from passing HB 0007 and HB 1557, a pair of bills that restricted teachers from discussing TGNCI history and critical race theory and that forced them to 'out' TGNCI students to their parents.

108.   Numerous Florida lawmakers applauded these developments and began to push local districts into rolling back any protections they had promulgated for queer and trans students.

109.   In November 2022, Manny Diaz, Chancellor for the Florida

Department of Education, sent letters to 10 school districts informing them that their LGBTQIA+ friendly policies were out of compliance with the new laws.

110.    The districts then rescinded the Transgender Support Guidelines and LGBTQIA+ Critical Support Guidelines and affirming policies.

111.    Other officials signaled their interest in removing gender-affirming care for youth, including state representative Randy Fine, who said he would work the following legislative session to expand the definition of "child abuse" to cover parental approval of gender-affirming care for their children.

112.    Jason Weida, the Secretary of the Agency for Healthcare Administration, coordinated the investigation into whether TGNCI healthcare for youth is "experimental," and issued numerous public statements in opposition to gender-affirming care.

113.    Weida made one of those statements at an ADF summit in the fall of 2022 when he described gender-affirming care as a "euphemism" for "mutilating organs of healthy children." Jason Weida (@weida_jason), Twitter (Mar. 14, 2023, 7:04 p.m.), https://twitter.com/weida_jason/status/1635778909873553408.

114.    By the start of the 2023 legislative session, lawmakers were prepared to introduce—and pass—additional anti-TGNCI legislation.

115.    Weida's investigation formed the basis for SB 254, which outlawed gender-affirming care in Florida for people under age 18 and mandated a 24-hour waiting period and informed consent requirement for adults.

116.    Former representative Sabatini—who is now running for Congress—

retweeted in support of a public statement from Daily Wire host Michael Knowles calling for states to ban transgender people and would later call for authorities to "BAN THE TRANS AGENDA." Anthony Sabatini (@AnthonySabatini), Twitter (Apr.                    11,                    3:36                    p.m.), https://x.com/anthonysabatini/status/1642149094712901635?s=46&t=HQyCKVazgdzRquaRwzRlyw.

117.   Representative Fine suggested the queer community needed to be eliminated to prevent grooming and said he targeted "Drag Queen Story Time" because    it    provided    a    "gateway    to    transgenderism." https://www.clickorlando.com/news/local/2023/04/12/florida-lawmaker-on-concept-of-erasing-lgbtq-community-over-drag-show-drama-damn-right/

118.   Weida retweeted information from the Society for Evidence-Based Gender Medicine (SEGM), an organization that advocates for banning TGNCI healthcare for minors and adults.

119.   Meanwhile, Governor DeSantis retweeted "Libs of Tik Tok," an online account known for doxxing, threatening, and encouraging violence against TGNCI people.

120.   The Bathroom Ban is an extension of this effort to implement an anti-TGNCI agenda.

**Fla. Stat. § 553.865 is an outgrowth of this explicitly anti-TGNCI agenda**

121.    Legislative materials also confirm that Fla. Stat. § 553.865 is an

outgrowth of an explicit, anti-TGNCI agenda, and that it expresses the viewpoint that TGNCI people are predatory and dangerous, and that their more nuanced understandings of sex and gender are fraudulent and illegitimate.

122.   During hearings concerning the statute, Florida state legislators acknowledged that Fla. Stat. § 553.865 targeted TGNCI people, including one of the co-sponsors of the bill.

123.   Representative Dean Black, a co-sponsor, celebrated the passage of HB 1521 on April 19, 2023 with a public tweet: "VICTORY! Today the Florida House passed HB 1521 which prohibits biological males from using women's restrooms in public facilities." Dean Black (@DeanBlackFL), Twitter (Apr. 19, 9:52 p.m.),

https://x.com/deanblackfl/status/1648882371716841475?s=46&t=HQyCKVazgdzRquaRwzRlyw.

124.   "Biological males" is the inaccurate term that lawmakers and anti-TGNCI organizations, including the ADF, use to describe transgender women who live daily lives as women.

125.   Lawmakers like Black use this term to imply that transgender women, in particular, are perpetrators of violence.

126.   Representative Johanna López countered that Fla. Stat. § 553.86 does not advance public safety; instead, it makes an imaginary enemy out of transgender people, who pose no public safety threat in the restroom.

127.   As Representative Ashley Viola Gantt noted, Fla. Stat. § 553.865

directs them and other TGNCI people to use bathrooms where they will be perceived as trespassers based on their gender identity and presentation, which opens them up to harassment, arrest and assault.

128.    Senator Tina Polsky called the bill one of several introduced in the Florida Legislature that targets LGBTQ+ people.

129.    Senator Lori Berman opposed the bill as unnecessary and said it served no legitimate purpose and afforded tremendous discretion to civilians and law enforcement.

130.    Other lawmakers compared Fla. Stat. § 553.865 to the Jim Crow era following chattel slavery where Florida authorities segregated restrooms by race.

131.    Representative Michele Rayner Goolsby said that by using sex stereotyping and profiling as its primary enforcement mechanisms, Fla. Stat. § 553.865 requires people to carry their birth certificates with them at all times like 'freedom papers' commonplace during slavery.

132.    Representative Allison Tant added that Fla. Stat. § 553.865 tacitly endorses genital checks for people who fail this sex stereotyping.

133.    Representative Plakon, the sponsor of HB 1521, acknowledged some of these concerns during a full hearing before the House of Representatives on May 3.

134.    Representative Plakon admitted there is a risk of people being falsely accused and prosecuted under the statute.

135.    Representative Plakon defended HB 1521 by saying that people

accusing individuals of being present in the wrong restroom have the burden of proving the individual was in the wrong restroom.

136.   However, Representative Plakon acknowledged that Fla. Stat. § 553.865 does not outline the evidence that is sufficient to identify who can be prosecuted under the bill.

137.   When asked how intersex people should avoid prosecution under the statute, Representative Plakon said they should carry doctor notes divulging their sensitive medical information about their condition.

138.   When asked how transgender people with gender affirming state-ID should proceed under the bill, Representative Plakon intimated that it was her intention to introduce bills to prevent transgender people from updating their gender markers on records of this type.

139.   Other lawmakers explicitly noted their intention to target TGNCI people with the Bathroom Ban.

140.   While addressing members of the public, including many trans people, who had provided testimony in a public hearing on HB 1521 on April 10, State Rep. Webster Barnaby (R-Deltona) referred to transgender people as "mutants," "demons," "and imps." Hearing on Facility Requirements Based on Sex, CS/HB 1521 2023 Session (Fla. Apr. 10, 2023), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8804 (time stamp 2:30:35 to 2:34:10).

141.   Representative Barnaby declared during his speech that "God created

men, male; and women, female." *Id.*

142.   Representative Barnaby continued: "[T]he Lord rebuke you Satan and all of your demons and imps that come parade before us. That's right I called you demons and imps who come and parade before us and pretend that you are part of this world." *Id.*

143.   In a separate case challenging one of Florida's anti-transgender laws, a respected federal judge referred to Barnaby's comments as evidence of invidious discrimination against transgender people. *Dekker v. Weida*, 4:22-cv-00325-RH-MAF (N.D. Fla. 2023), ECF 246, Order, Findings of Fact and Conclusions of Law, at 44.

144.   Judge Robert L. Hinkle wrote, "there has long been, and still is, substantial bigotry directed at transgender individuals. Common experience confirms this, as does a Florida legislator's remarkable reference to transgender witnesses at a committee hearing as 'mutants' and 'demons.'" *Id.*

145.   Other lawmakers unabashedly embraced Barnaby's remarks.

146.   The next day, Sabatini posted on his Twitter account that "it's time to stop the transgender mutants and demons without apology." Anthony Sabatini (@AnthonySabatini),        Twitter        (Apr.        11,        3:36        p.m.), https://twitter.com/AnthonySabatini/status/1645888500674314242.

147.   These discriminatory actions demonstrate that Fla. Stat. § 553.865 is about targeting TGNCI people, not protecting women and children.

***Coalition members organize a historic march in opposition to the Florida Bathroom Ban's targeting of TGNCI people***

148. In response to this bigotry, TGNCI people and nationwide organizations, including Plaintiff Women in Struggle, formed a coalition and began to organize a protest against the ban.

149. The coalition selected Orlando because they wanted to signal to TGNCI people in Florida, particularly TGNCI youth, that the outside world has not forgotten them.

150. Orlando is also symbolic because of the DeSantis administration's retaliation against entities, such as Disney or former State Attorney Worrell, that have opposed oppressive anti-LGBTQI+ state legislation.

151. The coalition has assembled an estimated 1,000 participants and upwards of 50 endorsements from organizations across the country who oppose Florida's campaign to erase TGNCI people from civil society.

152. Plaintiffs and members of the coalition have a different viewpoint than Florida lawmakers and private advocacy groups like the ADF about the intertwined nature of sex and gender.

153. Plaintiffs believe, consistent with medical experts and peer-reviewed scientific literature, that sex consists of numerous factors beyond reproductive anatomy at birth, including chromosomes; gender identity and brain sex/morphology; secondary sex characteristics like hair or breasts; internal

genitalia; fetal hormones; neurology; and more.[3]

154.   Plaintiffs believe the complex interplay between these factors mean that sex is not binary and immutable from birth, nor is it determined by a person's capacity to produce sperm or ova alone, as the statute purports.

155.   For instance, a person born with XX chromosomes may be incapable of producing eggs, and a person born with XY chromosomes may be incapable of producing sperm.

156.   In addition, a person may be born with XXY chromosomes, have breasts and be considered "female," but have a penile and a scrotum-like structure, which is known as Klinefelter's Syndrome.[4]

157.   Plaintiffs believe gender identity—a person's core internal sense of their own gender—is perhaps the most determinative factor when it comes to establishing a person's sex.

158.   Plaintiffs agree with the medical consensus that gender identity is innate.

159.   Plaintiffs believe transgender people are a valid sexual minority: they are simply people whose biological gender identity diverges from the sex assigned at birth.

160.   The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth. Typically, a person is assigned a sex

---

[3] Charlotte Chucky Tate, Ella Ben Hagai & Faye J. Crosby, Undoing the Gender Binary 8–11, 25 (2020).

[4] *Id*. at 9.

on their birth certificate solely based on the appearance of external reproductive organs at the time of birth.

161.   Plaintiffs believe this is a limited means of measuring someone's "sex," as it misses gender identity and other critical factors.

162.   In short, Plaintiffs believe sex is dynamic, encompasses more than reproductive birth genitalia, and is related to gender, which has a biological basis.

163.   Plaintiffs' viewpoints are in direct opposition to the viewpoints expressed in the ban and by Florida lawmakers over the last three years.

164.   Plaintiffs believe the Bathroom Ban is a symbolic erasure of their viewpoints and expressive conduct at a time of coordinated and heightened TGNCI animus.

165.   When TGNCI people use an affirming restroom or facility, they communicate an idea.

166.   Specifically, TGNCI people tell the world that they are their chosen gender, even if they were assigned a different sex at birth.

167.   This idea is understood in the context of a restroom because the state categorizes restrooms according to sex, and a person must select a facility that *best* captures their identity.

168.   Plaintiffs believe the statute forces them to embrace the state's viewpoint about their sex and gender.

169.   By forcing Plaintiffs like Ms. Butterfield, a Women in Struggle member; Ms. Kochan; Ms. Woods; and Ms. Kelly to use male restrooms or unisex

restrooms to avoid arrest, Fl Stat. § 553.865 coerces them into communicating that transgender women are actually ""males" and "men," even though it is a viewpoint with which they sincerely disagree.

170.   By forcing Plaintiffs like Mr. Fors and Mx. Spero to use female restrooms or face arrest when unisex restrooms are unavailable, Fla. Stat. § 553.865 coerces them into communicating that sex is binary and immutable and that non-binary people and transmasculine people are not real, even though it is a viewpoint with which they sincerely disagree.

171.   Whenever they comply with Fla. Stat. § 553.865 and use a non-affirming restroom, Plaintiffs (and their members) will have no way to disavow the state's viewpoint that sex is immutable and defined by one's reproductive capacity and their hormones at birth.

172.   Plaintiffs (and their members) believe that TGNCI people–and indeed, all people–should use public restrooms and facilities according to their sincerely held gender identities; their gender is for them to decide, not the state.

173.   TGNCI people have been using restrooms according to their sincerely held gender identities without harming anyone or inspiring cisgender men to commit gendered violence.

174.   There is no evidence that TGNCI people perpetuate or bring violence into their facilities of choice.

175.   When forced to use a non-affirming restroom, Plaintiffs and their TGNCI members violate their conscience and experience severe psychological

harm, harassment, and violence.

176.   They are also forced to communicate the state's viewpoint.

177.   Plaintiffs and their members are marching alongside coalition members and allies because they want to communicate their opposition to the policies that repress non-binary views about human nature and that harm TGNCI people.

### *Travel plans the week of the march*

#### *October 2: Arrival in Orlando*

178.   Beginning October 2, 2023, some out-of-state coalition members will arrive in Orlando for a final outreach push and for march preparations.

179.   Ms. Butterfield is one of those coalition members.

180.   Ms. Butterfield will be flying into the Orlando International Airport ("MCO") on September 29, 2023.

181.   Upon information and belief, the MCO is a public building "owned or leased" by the city of Orlando, a political subdivision of the state of Florida.

182.   Upon information and belief, the MCO contains unisex facilities and multi-stall facilities separated according to the definition of "sex" in Fla. Stat. § 553.865.

183.   Because she is a woman, Ms. Butterfield plans to use the womens' restroom during her stay in Florida, which exposes her to arrest and makes her scared to travel.

184.   Any other restroom option is unsafe and degrading for Ms.

Butterfield, who has full breasts and a feminine figure as a result of her hormone replacement therapy.

185.    However, Ms. Butterfield must locate someone to go to the women's restroom with her in case she encounters violence or someone who calls law enforcement on her.

186.    If the circumstances are unsafe for Ms. Butterfield to use the women's restroom, she will avoid using the restroom altogether, which will force her to hold her urine out of fear.

187.    Ms. Butterfield refuses to use a unisex restroom – when a women's room is available – as it is humiliating and degrading to her womanhood.

188.    Because Ms. Butterfield must either subject herself to arrest or modify her behavior to avoid arrest when she goes to urinate, the ban burdens her ability to plan a march that involves protected speech and symbolic conduct.

189.    Because Ms. Butterfield is also a member of Women in Struggle, the ban burdens the ability of Plaintiff Women in Struggle to plan a march that involves protected speech and symbolic conduct.

190.    Indeed, Plaintiff Women in Struggle has devoted many conversations to how to keep their TGNCI members and participants safe while using the restroom during the protest.

191.    Ms. Kochan will also arrive on October 2; she will be flying into the MCO with Ms. Butterfield, her fiancée.

192.    Ms. Kochan also plans to use the womens' restroom during her stay in

Florida, which exposes her to arrest and makes her scared to travel.

193.    Ms. Kochan does not want to use the womens' restroom alone and will go with Ms. Butterfield to the women's room.

194.    However, Ms. Butterfield and Ms. Kochan are not safe even when they travel together; even in New York, people have threatened the couple on public transportation because both women are transgender.

195.    If the circumstances are not safe for Ms. Kochan to use the women's restroom, she will either avoid using the restroom, which will force her to hold her urine out of fear, or use a unisex restroom.

196.    Ms. Kochan, however, does not want to use a unisex restroom when there is a women's restroom nearby, as it makes her feel degraded, singled out, and an isolated target for anyone who wants to harm trans people in the restroom.

197.    Any other restroom option is unsafe and degrading for Ms. Kochan, who has full breasts and a feminine figure as a result of her hormone replacement therapy.

198.    Because Ms. Kochan must either subject herself to arrest or modify her behavior to avoid arrest when she goes to urinate, the ban burdens her ability to plan a march that involves protected speech and symbolic conduct.

199.    Ms. Wood and Ms. Kelly will also be flying into the MCO on October 2; they, too, will be traveling together.

200.    Upon information and belief, the MCO is a public building "owned" by the city of Orlando, a political subdivision of the state of Florida.

36

201.   Upon information and belief, Ms. Wood and Ms. Kelly must use the restroom at the MCO after a roughly five-hour plane ride from California.

202.   Ms. Wood and Ms. Kelly refuse to be pressured into using anything but the women's restroom in Florida, which exposes them to arrest.

203.   Although Ms. Wood and Ms. Kelly plan to use the women's restroom at the same time to watch out for each other, their safety is far from guaranteed due to their activism.

204.   Ms. Woods became a target of anti-TGNCI groups in January after a teenager who had shared a bathroom with her alleged at a City Council meeting that she posed a threat to children.

205.   As part of this targeting, an anti-TGNCI group sent a teenager into the women's changing facility at a YMCA in San Diego where Ms. Wood frequently does water aerobics.

206.   This teenager accused Ms. Wood of being in the wrong restroom because Ms. Wood allegedly had male genitalia.

207.   Ms. Wood does not have male genitalia due to the gender-confirmation surgery she received more than three years ago.

208.   This accusation slandered and degraded Ms. Wood's womanhood.

209.   Ms. Wood, Ms. Kelly, and many others supported her right to use an affirming changing facility before their law-making body, the Santee City Council.

210.   Throughout this process, Ms. Wood received national attention from media outlets like the New York Post, Fox News, the Daily Beast, and more.

211.   Ms. Kelly is also an activist; she is the Vice President of the San Diego Chapter of Flux, an international organization dedicated to uplifting, empowering, and creating safe spaces for transgender, non-binary and gender-non conforming "("trans") people so that they can just be themselves, and live free of fear or persecution.

212.   Upon information and belief, Ms. Wood and Ms. Kelly face heightened danger in any womens' restroom in Florida due to this publicized advocacy.

213.   At the same time, any other restroom option is unsafe, degrading, and inconvenient for Ms. Wood and Ms. Kelly.

214.   In Ms. Kelly's experience, unisex restrooms are not widely available and they single her out and communicate that she is not really a woman.

215.   Moreover, both Ms. Wood and Ms. Kelly are women: they have full breasts, feminine figures, and otherwise anatomically identical bodies to most cisgender women as a result of their hormone replacement therapy and gender-confirmation surgery.

216.   The idea, in particular, of going to the men's restroom with this anatomy makes Ms. Kelly incredibly anxious about the possibility of being ogled or harassed.

217.   Ms. Kelly wonders how law enforcement would prove that she is a man for purposes of sending her to the men's restroom since her state identity documents reflect that her sex is "female" and since she has the same anatomy as other women.

218.   Because Ms. Wood and Ms. Kelly must subject themselves to arrest to urinate, the ban burdens their ability to engage in protected speech and expressive conduct.

219.   Plaintiff Fors arrives as well on October 6; he, too, will be flying into the MCO.

220.   Upon information and belief, the MCO is a public building "owned or leased" by the city of Orlando, a political subdivision of the state of Florida.

221.   Upon information and belief, Mr. Fors must use the restroom at the Orlando International Airport after his five-hour flight from California.

222.   Like the other Plaintiffs, Mr. Fors fears arrest under Fla. Stat. § 553.865 if he uses the men's restroom.

223.   Once he arrives in Florida, Mr. Fors will be on high alert and is particularly anxious coming from a more affirming state like California.

224.   To avoid arrest, Mr. Fors will use the women's restroom out of fear of arrest even though he has a masculine gender identity, voice, and presentation.

225.   The women's restroom is an inherently dangerous place for transmasculine and agender people who have non-binary gender presentations, because they risk being perceived as cisgender men who are unlawfully present just to prey on women.

226.   Due to his deep voice, Mr. Fors will not speak in the women's restroom to avoid being perceived as a man and having security called on him.

227.   Mr. Fors believes unisex restrooms are humiliating and othering, and

that they send a message that it is ok for the state to force TGNCI people into an invalidating facility–but he will use one if necessary to urinate.

228.   Being forced to preemptively invalidate his identity causes Mr. Fors great psychological distress and worsens his gender dysphoria; in his words, it feels like being "stabbed."

229.   This distress makes Mr. Fors feel a person without a country: Society does not deem him to be a legitimate man but nor is he simply a woman.

230.   Because Mr. Fors must modify his behavior to avoid arrest when he urinates, the ban burdens his ability to engage in protected speech and expressive conduct.

### *October 2 - October 5: Final Preparations*

231.   Ms. Butterfield, Ms. Kochan, and other Women in Struggle members will spend the week of October 2 through October 6 doing final preparations for the march.

232.   Those preparations include protected speech activities such as handing out leaflets promoting the march, inviting interested people to join, and coordinating the press conference and other aspects of the march.

233.   Ms. Butterfield, Ms. Kochan, and Women in Struggle members plan to promote the march for several continuous hours on school campuses such as the University of Central Florida ("UCF").

234.   Upon information and belief, the UCF is a postsecondary educational institution and thus an "educational institution" subject to the ban. Fla. Stat. §

553.865(3)(e).

235.   Upon information and belief, Ms. Butterfield, Ms. Kochan, Women in Struggle members, and other similarly situated TGNCI coalition members will have to use a restroom when they are present at this educational institution because of the duration of their on-campus protected activities.

236.   Ms. Butterfield and Ms. Kochan plan to use the womens' facilities in these public buildings or hold their urine out of fear if the circumstances are too dangerous to relieve themselves in these facilities.

237.   However, upon information and belief, Ms. Butterfield and Ms. Kochan will only use the womens' facilities if they have a cisgender ally from Plaintiff Women in Struggle with them.

238.   Because Ms. Butterfield, Ms. Kochan, Women in Struggle members, and other similarly situated TGNCI coalition members must subject themselves to arrest or modify their behavior to avoid arrest when they urinate, the ban burdens their ability to engage in protected speech and symbolic conduct.

239.   Upon information and belief, Ms. Butterfield, Ms. Kochan, and other similarly situated TGNCI coalition members will also encounter other public buildings as they pass out leaflets and promote the march.

240.   Upon information and belief, Ms. Butterfield, Ms. Kochan, and other TGNCI coalition members must use the restrooms in these other public buildings during their final preparations.

241.   Upon information and belief, Ms. Butterfield, Ms. Kochan, Women in

Struggle members, and other TGNCI coalition members must use these restrooms because these restrooms are close to the areas where they will be doing their final outreach.

242.   Ms. Butterfield and Ms. Kochan plan to use the womens' facilities in these public buildings or hold their urine out of fear if the circumstances are too dangerous to relieve themselves in these facilities.

243.   Upon information and belief, Plaintiff Women in Struggle members must accompany them to the women's restroom to assure their safety.

244.   Because Ms. Butterfield, Ms. Kochan, Women in Struggle members, and other similarly situated TGNCI coalition members must either subject themselves to arrest or modify their behavior to avoid arrest when they urinate, the ban burdens their ability to engage in protected speech and expressive conduct.

*October 6: Press Conference*

245.   The day before the protest, coalition members will hold a press conference in downtown Orlando to bring additional attention to the anti-TGNCI perspectives dominating statehouses across the country, including Florida.

246.   Women in Struggle members will participate in and help coordinate this press conference, including by handing out water bottles to speakers, keeping track of the speaking order, and accompanying TGNCI people to the restroom as needed.

247.   The coalition will host their press conference beginning at noon across the street from Orlando City Hall at 400 S. Orange Street, Orlando FL 32802.

248.   Numerous TGNCI people will speak at this event, including Miss Major Griffin Gracy, a trans activist based in Arkansas who participated in the Stonewall Uprising in 1969, a pivotal moment in the queer rights movement in the United States.

249.   Upon information and belief, Orlando City Hall ("OCH") is a public building "owned" by the city of Orlando, a political subdivision of the state of Florida.

250.   Upon information and belief, OCH is a public building subject to the Bathroom Ban.

251.   Upon information and belief, OCH will be open during the October 6 press conference.

252.   Upon information and belief, there are no alternative affirming restrooms sufficient in number to meet the need of Plaintiffs and other protesters throughout the entirety of the press conference in this area.

253.   Upon information and belief, Plaintiffs Butterfield, Fors, Kochan, Kelly, Wood, Women in Struggle members, and other similarly situated TGNCI coalition members and speakers must use the public restroom at OCH during the roughly two to three hours they are in the area.

254.   Plaintiffs and other similarly situated TGNCI protect participants will not be able to use an affirming restroom at OCH without violating the law.

255.   After the press conference, Plaintiffs Butterfield, Fors, Kochan, Kelly, Wood, Women in Struggle members, and other coalition members and speakers

43

must do a final walk-through of the march site and the march route.

256.   The march site will begin across the street from OCH at the Arts Plaza park that borders the Dr. Phillips Center for the Performing Arts ("the Phillips Center").

257.   The march route will travel along the perimeter of the Arts Plaza along Magnolia Avenue, South Street, and Orange Street numerous times.

258.   The walkthrough of the march site and march route put Plaintiffs and other TGNCI coalition members and speakers in close proximity to the Phillips Center in addition to OCH.

259.   Upon information and belief, the City of Orlando owns the Phillips Center.

260.   Upon information and belief, the Phillips Center is a "public building" "owned" by a political subdivision of the state of Florida.

261.   Upon information and belief, the Phillips Center is thus a building subject to the Bathroom Ban.

262.   Upon information and belief, the Phillips Center has walk-up hours and will be open to the public during the press conference on October 6.

263.   Upon information and belief, Plaintiffs Butterfield, Fors, Kochan, Kelly, Wood, Women in Struggle members, and other similarly situated TGNCI coalition members and speakers must use the restroom at either OCH or the Phillips Center during their roughly two-to-three-hour press conference and final walk-through of the march site.

264.    Plaintiffs and other similarly situated TGNCI protest participants will not be able to use an affirming restroom at the Phillips Center without violating the law.

265.    Because Plaintiffs Butterfield, Fors, Kochan, Kelly, Wood, Women in Struggle members, and other similarly situated TGNCI coalition members and speakers must either subject themselves to arrest or modify their behavior to avoid arrest when they urinate, the Bathroom Ban burdens their ability to engage in protected speech, assembly, and symbolic conduct.

*October 7: Day of the March*

266.    On October 7, the forecast predicts highs of nearly 90 degrees Fahrenheit in Orlando.

267.    Plaintiffs and other coalition members and protesters must hydrate throughout the day due to the heat.

268.    Plaintiffs and coalition members have a 10-hour day of speaking and marching planned for October 7.

269.    Beginning at 8 a.m., Plaintiffs Butterfield, Fors, Kochan, Kelly, Wood, Women in Struggle members, and other coalition members will begin set up at OCH and the Arts Plaza across the street.

270.    Plaintiffs Butterfield, Fors, Kochan, Kelly, Wood, Women in Struggle members, and other coalition members will remain in this area until noon.

271.    Other Plaintiffs will drive to Orlando the morning of October 7 for the march.

272.   Lindsey Spero is driving from their home in Pinellas County to Orlando with other TGNCI protest participants.

273.   As Spero and their friends drive along Interstate 275 ("I-275") and Interstate 4 ("I-4"), they will encounter a rest stop in Polk County, Florida.

274.   Upon information and belief, rest stops are buildings owned or leased by the state of Florida and thus subject to Fla. Stat. § 553.865.

275.   Spero will not use the restroom at this rest stop, despite having a roughly three-hour drive, because Fla. Stat. § 553.865 causes them great fear.

276.   As a result of several years of hormone replacement therapy, Spero has facial hair, a deep voice, and an otherwise masculine presentation.

277.   Being forced to hold their urine causes Spero to be a more distracted driver and brings a higher potential for harm for themselves and the people they're driving.

278.   Holding his urine also increases Spero's risk of a urinary tract infection ("UTI").

279.   Once they arrive in Orlando, Spero will not use a public restroom out of fear of harassment, violence, and/or arrest.

280.   Having to make any alternative arrangements increases Spero's fear and anxiety: It puts them on guard during a routine activity that cisgender people in society take for granted.

281.   At noon, Spero and the other Plaintiffs and marchers will gather for the opening rally.

282.   The opening rally will take place from noon until 1 p.m., also in the park across Orlando City Hall and S. Orange Street.

283.   Upon information and belief, Plaintiffs and other TGNCI protest participants must use the restroom between 8 a.m. and 1 p.m.

284.   Upon information and belief, there are no alternative affirming restrooms sufficient in number to meet the need of Plaintiffs and other protesters throughout the entirety of the press conference in this area.

285.   Upon information and belief, Plaintiffs and other TGNCI protest participants will be around the Phillips Center, a public building subject to enforcement under Fla. Stat. § 553.865.

286.   Upon information and belief, the Phillips Center will be open to the public from 12 p.m. to 4 p.m. and will open, again, at 6 p.m., two hours before its featured evening show on October 7.

287.   From 1 p.m. to 2 p.m., Plaintiffs and the protest participants will march and chant through the Arts Plaza district that borders the Phillips Center.

288.   Upon information and belief, Plaintiffs and other similarly situated protest participants will be in the vicinity of the public restrooms at the Phillips Center.

289.   Upon information and belief, Plaintiffs and other similarly situated TGNCI protest participants and protesters must use the restroom in this area during the march.

290.   Upon information and belief, non-TGNCI members of Plaintiff

Women in Struggle will accompany TGNCI protesters to the restroom to ensure their safety.

291.   From 2 p.m. to 4 p.m., Plaintiffs and the coalition members and protesters will host a "speak-out" back at the park across S. Orange St. and Orlando City Hall.

292.   From 4:30 p.m. to 6 p.m., Plaintiffs Butterfield, Fors, Kochan, Kelly, Wood, Women in Struggle members, and other coalition members will take down any equipment and clean up the area.

293.   Upon information and belief, Plaintiffs and other TGNCI coalition members and protesters will be in close proximity to the Phillips Center.

294.   Upon information and belief, Plaintiffs, including Women in Struggle members, and other TGNCI coalition members and protesters must use the restroom at the Phillips Center sometime between 2 p.m. and 6 p.m.

295.   Upon information and belief, the Phillips Center will be open for a portion of this four-hour window.

296.   Plaintiffs and other similarly situated TGNCI protest participants will not be able to use an affirming restroom at the Phillips Center without violating the law.

297.   Around this time, Spero will begin their drive home to Pinellas County.

298.   For the second time on October 7, they must hold their urine for the three-hour drive along I-4 and I-275.

299.   As noted above, Spero will not stop at the rest stop in Polk County along the way that is subject to the ban.

300.   Because Spero must modify their behavior to avoid arrest when they urinate, the Bathroom Ban burdens their ability to engage in protected speech, assembly, and symbolic conduct.

*October 8: Traveling home*

301.   Most out-of-state coalition members and protesters are either flying out or driving home on Sunday, October 8.

302.   For Plaintiffs Butterfield, Fors, Kochan, Kelly, and Wood, this means traveling once more through the MCO on October 8.

303.   Upon information and belief, the MCO is a public government building subject to enforcement under Fla. Stat. § 553.865.

304.   Upon information and belief, Plaintiffs Butterfield, Fors, Kochan, Kelly, and Wood must use the restroom at the MCO as they wait for their flights to leave on October 8.

305.   Because these Plaintiffs must violate the law or modify their behavior when they urinate to avoid arrest, the Bathroom Ban burdens their exercise of speech and expressive conduct.

**PLAINTIFFS' URGENT NEED FOR DECLARATORY AND INJUNCTIVE RELIEF**

306.   An actual and substantial controversy exists between the Plaintiffs and the Defendants as to their respective legal rights.

307.   Although Plaintiffs further assert Fla. Stat. § 553.865 violates the U.S. Constitution, Defendants are legally obligated to enforce the law unless this court finds it unconstitutional as applied and/or issues a temporary restraining order.

308.   Plaintiffs face an imminent threat of harm under Fla. Stat. § 553.865 because Defendants have the authority to enforce Fla. Stat. § 553.865, and Defendants do not have any discretion when it comes to applying the statute against Plaintiffs and other TGNCI people who seek to use affirming restrooms.

309.   Fla. Stat. § 553.865 subjects governmental agencies and their personnel to penalties and discipline if they allow TGNCI people to use restrooms consistent with their legal sex or gender contrary to Fla. Stat. § 553.865.

310.   Governor DeSantis has also announced his intention to strictly enforce Fla. Stat. § 553.865 and related laws across the state through use of executive authority, including by removing government officials who do not enforce legal mandates.

311.   Governor DeSantis has already removed two government officials from their posts when they have refused to enforce laws like Fla. Stat. § 553.865 against TGNCI individuals.

312.   Defendants are therefore subject to an ongoing duty to that Fla. Stat. § 553.865 is uniformly and consistently enforced in public restrooms across Florida, including the restrooms that Plaintiffs intend to frequent while traveling to, promoting, and participating in the Orlando protest.

313.   Plaintiffs face an imminent threat of enforcement under Fla. Stat. §

553.865 because Defendants and the governmental agencies they serve have not publicly announced their intention to disregard the law or provided any reason to doubt that they will, in fact, enforce Fla. Stat. § 553.865.

314.    Upon information and belief, defendant Bain will enforce Fla. Stat. § 553.865 because Governor DeSantis appointed him to replace a State Attorney who used her prosecutorial discretion to decline to enforce it.

315.    Bain has also said that he will faithfully execute all of the laws of the state of Florida, including Fla. Stat. § 553.865, which he has the power to do as State Attorney.

316.    The remaining Defendants also have authority to enforce Fla. Stat. § 553.865, or are involved in compliance with Fla. Stat. § 553.865, and intend to enforce the law due to DeSantis's executive order and due to their failure to issue any public statements suggesting they will not enforce the law.

317.    Like defendant Bain, defendant Smith has a duty to enforce the state laws of Florida in the city of Orlando, including Fla. Stat. § 553.865.

318.    Defendant Smith has given no indication that he will ignore his duty and thus has threatened to enforce Fla. Stat. § 553.865 against Plaintiffs.

319.    Similarly, Defendant Mina has a duty to enforce the state laws of Florida in Orange County, which includes the city of Orlando.

320.    Defendant Mina has given no indication that he will ignore his duty and thus has threatened to enforce Fla. Stat. § 553.865 against Plaintiffs.

321.    Defendant Edmonds oversees "the operation and administration" of

51

each city building in Orlando, including OCH.

322.   The buildings that Defendant Edmonds oversees must follow the local and state ordinances around building compliance, which includes Fla. Stat. § 553.865, otherwise they risk fines and other penalties.

323.   Because Defendant Edmonds is involved in the operation and administration of buildings that must follow Fla. Stat. § 553.865 or be fined, he has power to effect the enforcement of this law and intends to do so, upon information and belief.

324.   Defendant Dunn oversees daily operations and maintenance at these city facilities and, upon information and belief, must report any non-compliance with Fla. Stat. § 553.865.

325.   Because Dunn is involved in the administration and enforcement of Fla. Stat. § 553.865 in public and government buildings that must follow the law or be fined, he has power to effect the enforcement of this law and intends to do so, upon information and belief.

326.   Defendant Keith has a duty to "ensure compliance with the codes and ordinances of the city," including Fla. Stat. § 553.865.

327.   Defendant Keith has given no indication that he will ignore this duty and thus has threatened to enforce the law against Plaintiffs.

328.   Defendant Tong oversees daily operations, which, upon information and belief, includes legal compliance at the Phillips Center, including Fla. Stat. § 553.865.

329.   Upon information and belief, as a city-owned building with multi-stall restrooms, the Phillips Center must comply with and enforce Fla. Stat. § 553.865.

330.   Because the Phillips Center must comply with Fla. Stat. § 553.865 or risk fines or other licensure-related penalties, Defendant Tong intends to enforce the law against Plaintiffs, upon information and belief.

331.   Defendant Martin helps oversee the University of Florida's daily operations, management, and legal compliance, including with Fla. Stat. § 553.865.

332.   As a "post-secondary education building," the University of Central Florida must comply with Fla. Stat. § 553.865 and issue affirmative and consistent regulations concerning discipline under the law.

333.   Because the University of Central Florida must comply with Fla. Stat. § 553.865 or risk fines and other penalties, Defendant Martin intends to enforce the law against Plaintiffs, upon information and belief.

334.   Defendant Draper oversees daily operations at MCO, which includes supervising restrooms and facilities subject to Fla. Stat. § 553.865.

335.   Because MCO must follow Fla. Stat. § 553.865 or risk being fined and other penalties, Draper has authority to enforce the law and intends to do so, upon information and belief.

336.   Defendant Perdue is responsible for promulgating statewide FDOT regulations concerning rest stops that result in uniform compliance with the laws of Florida, including Fla. Stat. § 553.865.

337.   Because rest stops are subject to Fla. Stat. § 553.865, Perdue must promulgate regulations consistent with Fla. Stat. § 553.865 and enforce them.

338.   Perdue has authority to enforce Fla. Stat. § 553.865 and intends to do so, upon information and belief.

339.   Defendant Tyler must enforce Perdue's regulations and ensure that travelers using FDOT rest stops comply with the law, including Fla. Stat. § 553.865, in FDOT District 5, which covers the Central Florida region, including Orlando.

340.   Tyler has authority to enforce Fla. Stat. § 553.865 and intends to do so, upon information and belief.

341.   Upon information and belief, in order to comply with the provisions of Fla. Stat. § 553.865 and to avoid legal sanction, Defendants have also instructed their personnel to order TGNCI people (or people they suspect to be TGNCI) to leave affirming restrooms or face arrest in the event they refuse.

342.   Due to the coercion they face from Defendants' threatened enforcement of law, Plaintiff Fors feels compelled to use restrooms designated for their opposite sex against their will and contrary to their physical and psychological safety while Plaintiff Spero will likely relieve themselves somewhere outside.

343.   Because using a non-affirming restroom violates their conscience, Plaintiffs Butterfield, Kelly, Kochan, Wood, and Plaintiff Women in Struggle's members intend to use affirming restrooms in buildings subject to Fla. Stat. § 553.865–thus violating the law–and will refuse to leave, even when instructed by

Defendants and their personnel and subjected to arrest, if accompanied by cisgender allies.

344.    By violating the Plaintiffs' federal rights and/or causing them to modify their behavior and compel speech about their gender with which they disagree, Defendants have caused and will continue to cause irreparable harm to Plaintiffs while acting under color of state law.

345.    Plaintiffs have no plain, speedy, or adequate remedy at law against the harms they face due to Defendants' enforcement of Fla. Stat. § 553.865 other than the relief they have requested in this complaint.

346.    Accordingly, Plaintiffs are entitled to a declaration that Fla. Stat. § 553.865 is unconstitutional as applied to them and similarly situated TGNCI individuals traveling to and from protest under the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Due Process Clause of the Fourteenth Amendment, the Full and Credit Clause under Article IV, Section 1 of the U.S. Constitution, and Article I, Section 2 of the Florida Constitution, and to an order temporarily restraining Defendants from its enforcement until October 8.

### CAUSES OF ACTION

**COUNT ONE**
**VIOLATION OF THE RIGHT TO BE FREE FROM STATE VIEWPOINT DISCRIMINATION GUARANTEED BY THE FIRST AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION**

*(As to all Plaintiffs and all Defendants)*

347.    Plaintiffs incorporate the allegations in ¶¶ 1-164, ¶¶ 172-174, ¶¶ 178-

244, ¶¶ 271-280, ¶¶ 282-305, and ¶¶ 306-346 herein.

348.   Fla. Stat. § 553.865 violates the right of Plaintiffs and other similarly situated TGNCI people to be free from state viewpoint discrimination as guaranteed by the First and Fourteenth Amendments of the U.S. Constitution.

349.   This is because Fla. Stat. § 553.865 contains a viewpoint that sex is based on immutable reproductive birth anatomy and birth hormones, and that TGNCI people must be excluded from restrooms and changing facilities that correspond to their gender-identity (and at times legal-sex) to ensure safety.

350.   This viewpoint excludes TGNCI people from affirming facilities because they believe sex results in more than two binary and unchanging genders, and that it can safely include gender identity and other sexual/gender minorities.

351.   Fla. Stat. § 553.865's viewpoint discrimination forces Plaintiffs to violate the law to express themselves; to use a non-affirming restroom that will subject them to more danger; or hold their urine out of fear.

352.   As alleged above, Defendants have the authority as well as the obligation to enforce Fla. Stat. § 553.865 against Plaintiffs, and are responsible for Plaintiffs' ongoing injuries.

353.   There is no narrowly tailored, compelling reason for Defendants enforcing this viewpoint across the state in a way that treats TGNCI people unequally. Nor is Defendants' enforcement of Fla. Stat. § 553.865 rationally related to or supported by a legitimate state interest.

354.   Fla. Stat. § 553.865 is unconstitutional as applied to Plaintiffs and

other similarly situated TGNCI protest participants and coalition members.

## COUNT TWO
## VIOLATION OF THE RIGHT TO BE FREE FROM COMPELLED SPEECH FROM THE STATE GUARANTEED BY THE FIRST AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION

*(As to all Plaintiffs and all Defendants)*

355.    The Plaintiffs incorporate the allegations in ¶¶ 1-165, ¶¶ 168-175,  178-244, ¶¶ 271-280, ¶¶ 282-305, and ¶¶ 306-346 herein.

356.    Fla. Stat. § 553.865 violates the right of Plaintiffs and other similarly situated TGNCI people to be free from compelled speech that conflicts with a sincerely held belief as guaranteed by the First and Fourteenth amendments of the U.S. constitution.

357.    Fla. Stat. § 553.865 forces Plaintiffs to either violate the law or to use a non-affirming facility that forces them to bear the *state's* message that they are only their reproductive anatomy present at birth.

358.    Alternatively, Fla. Stat. § 553.865 forces them to use a unisex facility or make other arrangements, both of which coerce them to embrace an idea that they are "othered" members of society who do not deserve to use an affirming restroom like everyone else.

359.    As alleged above, Defendants have the authority as well as the obligation to enforce Fla. Stat. § 553.865 against Plaintiffs, and are responsible for Plaintiffs' ongoing injuries.

360.    There is no narrowly tailored compelling reason for Defendants

forcing Plaintiffs and other TGNCI people to bear these conflicting, "othering" messages about themselves. Nor is Defendants' enforcement of Fla. Stat. § 553.865 rationally related to or supported by a legitimate state interest.

361.   As a result Fla. Stat. § 553.865 is unconstitutional as applied to Plaintiffs and other similarly situated TGNCI coalition members and protesters.

**COUNT THREE**
**VIOLATION OF THE RIGHT TO ASSEMBLY GUARANTEED BY THE FIRST AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION**

*(As to all Plaintiffs and all Defendants)*

362.   The Plaintiffs incorporate the allegations in ¶¶ 1-149, ¶ 162, ¶¶ 172–174, ¶¶ 177-244, ¶¶ 271-280, ¶¶ 282-305, and ¶¶ 306-346 herein.

363.   Fla. Stat. § 553.865 impermissibly burdens the right of Plaintiffs and other similarly situated TGNCI protesters to peaceful assembly as guaranteed by the First and Fourteenth amendments of the U.S. constitution.

364.   Fla. Stat. § 553.865 forces Plaintiffs and other similarly situated TGNCI participants to either violate the law or to withhold their urine out of fear during their travels into the state and during the protest.

365.   These impositions burden the right to peacefully assemble to express protected grievances about the state of Florida's anti-TGNCI agenda.

366.   As alleged above, Defendants have the authority as well as the obligation to enforce Fla. Stat. § 553.865 against Plaintiffs, and are responsible for Plaintiffs' ongoing injuries.

367.   There is no narrowly drawn, substantial government interest to support this impermissible burden placed on Plaintiffs by Defendants' enforcement of the statute. Nor is Defendants' enforcement of Fla. Stat. § 553.865 rationally related to or supported by a legitimate state interest.

368.   Fla. Stat. § 553.865 is unconstitutional as applied to Plaintiffs and similarly situated TGNCI participants.

**COUNT FOUR**
**VIOLATION OF THE RIGHT TO EXPRESSIVE SPEECH GUARANTEED BY THE FIRST AND FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION**

*(As to all Plaintiffs and all Defendants)*

369.   The Plaintiffs incorporate the allegations in ¶¶ 1-167, ¶¶ 172–175, ¶¶ 177-244, ¶¶ 271-280, ¶¶ 282-305, and ¶¶ 306-346 herein.

370.   Fla. Stat. § 553.865 impermissibly burdens the right of Plaintiffs and other similarly situated TGNCI protesters to engage in symbolic speech and expressive conduct guaranteed by the First and Fourteenth Amendments of the U.S. constitution.

371.   When TGNCI people use an affirming restroom or facility, they engage in symbolic speech because they communicate to the world and all who perceive them that they are their chosen gender, even if that gender differs from their sex assigned at birth.

372.   This is an idea that TGNCI people communicate publicly.

373.   Outsiders reasonably understand this idea in the context of a

restroom for two reasons.

374.   First, because the state categorizes restrooms according to sex, a person must pick one restroom over the other that best captures their sexual identity.

375.   Thus, a TGNCI person voluntarily represents an idea of self whenever they use an affirming restroom or changing facility.

376.   Second, non-TGNCI people reasonably understand that a TGNCI person's use of an affirming restroom communicates an idea *because* TGNCI people are a small, visually different segment of the population that diverges from the norm.

377.   When a cisgender person uses the restroom, they also communicate that they are their gender—but this is not a significant act because cisgender people comprise roughly 98 percent of the human population.

378.   When cisgender people use the restroom, nobody doubts that cisgender people are in the right place—unless they are perceived as atypical.

379.   When a TGNCI person uses an affirming restroom, that same presumption of correctness does not exist.

380.   A TGNCI person's use of an affirming restroom communicates to the world that they are a correct – albeit different – representation of their gender.

381.   Suppressing this expression causes Plaintiffs great anguish, anxiety, and worsens their gender dysphoria.

382.   As alleged above, Defendants have the authority as well as the

obligation to enforce Fla. Stat. § 553.865 against Plaintiffs, and are responsible for Plaintiffs' ongoing injuries.

383.   There is no narrowly drawn substantial government interest in Fla. Stat. § 553.865 that is unrelated to this expressive speech. Nor is Defendants' enforcement of Fla. Stat. § 553.865 rationally related to or supported by a legitimate state interest.

384.   Fla. Stat. § 553.865's goal of protecting women and children from male violence is unsupported by the evidentiary record and is a pretext to discriminate against TGNCI expression.

385.   Furthermore, there is no privacy right to exclude a disfavored minority from an affirming facility they also need to use.

386.   Fla. Stat. § 553.865 is unconstitutional as applied to Plaintiffs and other similarly situated TGNCI protest participants.

## COUNT FIVE
### VIOLATION OF THE RIGHT TO INTERSTATE TRAVEL GUARANTEED BY THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION

*(As to Plaintiffs Butterfield, Fors, Kelly, Kochan, Wood, and Women in Struggle, on behalf of its members, and Defendants Bain, Smith, Perdue, Tyler & Draper)*

387.   The Plaintiffs incorporate the allegations in ¶¶ 1-162, ¶¶ 165-167, ¶¶ 172–174, ¶¶ 177-244, ¶¶ 282-305, and ¶¶ 306-346 herein.

388.   Fla. Stat. § 553.865 violates the right of Plaintiffs and other similarly situated TGNCI protesters to interstate travel guaranteed by the Fourteenth Amendment of the U.S. constitution.

389.   Specifically, the Statute impedes their right to travel freely to and from the State of Florida by preventing them from making use of airport and highway restroom facilities consistent with their gender and in many instances their legally-recognized sex.

390.   Fla. Stat. § 553.865 further treats TGNCI visitors to the state as "unfriendly aliens" rather than "welcome visitor[s]" due to the ban's prohibition on them and only them using an affirming restroom in a public building.

391.   This imposition is significant because the Plaintiffs and the other similarly situated TGNCI participants' right to travel is infused with speech, assembly, and protest rights.

392.   There is no legitimate reason to burden this right to interstate travel such that an entire class of people cannot equally exercise their speech and protest freedoms. Nor is Defendants' enforcement of Fla. Stat. § 553.865 rationally related to or supported by a legitimate state interest.

393.   As alleged above, Defendants have the authority as well as the obligation to enforce Fla. Stat. § 553.865 against Plaintiffs, and are responsible for Plaintiffs' ongoing injuries.

394.   Fla. Stat. § 553.865 is unconstitutional as applied to Plaintiffs and other similarly situated TGNCI protest participants.

**COUNT SIX**
**VIOLATION OF THE RIGHT TO INTRASTATE TRAVEL**
**GUARANTEED BY ART. I SEC. 2 OF THE FLORIDA CONSTITUTION**

*(As to Plaintiff Spero and Defendants Tyler and Perdue)*

395.   The Plaintiffs incorporate the allegations in ¶¶ 1-163, ¶¶ 165-167, ¶¶ 172–174, ¶¶ 271-280, and ¶¶ 306-346 herein.

396.   Fla. Stat. § 553.865 violates the right of Mx. Spero and other similarly situated TGNCI Florida residents to intrastate travel guaranteed by Article I, Section 2 of the Florida Constitution.

397.   Specifically, Fla. Stat. § 553.865 significantly burdens Mx. Spero and TGNCI Floridians' right to travel freely within the State of Florida and shackles them to their homes by denying them the opportunity to safely access restrooms while traveling within the State of Florida.

398.   Fla. Stat. § 553.865 prevents Mx. Spero and others from using airport and highway restroom facilities consistent with their gender and, in many instances, their legally-recognized sex, which is tantamount to denying them the ability to use the restroom *at all*.

399.   This imposition is significant because Mx. Spero and other similarly situated TGNCI participants' right to travel is infused with speech, assembly, and protest rights.

400.  As alleged above, Defendants have the authority as well as the obligation to enforce Fla. Stat. § 553.865 against Plaintiffs, and are responsible for Plaintiffs' ongoing injuries.

401.   There is no compelling or legitimate basis for burdening the right to intrastate travel such that an entire class of people cannot equally exercise their

speech and protest freedoms. Nor is Defendants' enforcement of Fla. Stat. § 553.865 rationally related to or supported by a legitimate state interest.

402.   Fla. Stat. § 553.865 is unconstitutional as applied to Plaintiffs and other similarly situated TGNCI protest participants.

**COUNT SEVEN**
**VIOLATION OF THE RIGHT TO BE FREE FROM INVIDIOUS DISCRIMINATION AGAINST A POLITICAL MINORITY GUARANTEED BY THE FOURTH AMENDMENT OF THE U.S. CONSTITUTION**

*(As to all Plaintiffs and all Defendants)*

403.   The Plaintiffs incorporate the allegations in ¶¶ 1-177 and ¶¶ 306-346 herein.

404.   Fla. Stat. § 553.865 violates the right of Plaintiffs and other similarly situated TGNCI protesters to be free from invidious discrimination against a political minority as guaranteed by the Fourteenth Amendment of the U.S. constitution.

405.   Fla. Stat. § 553.865 is a byproduct of years of coordinated legislative, executive, and private animus against TGNCI people.

406.   Numerous lawmakers have referred to TGNCI life as an extremist ideology that harms women and children—regardless of contrary evidence.

407.   Lawmakers have denigrated TGNCI healthcare, sports participation, history, and tried to separate queer and trans families.

408.   One lawmaker during the Bathroom Ban debates went so far as to call TGNCI people "demons," "mutants," and "imps."

409.   Other public comments demonstrate that lawmakers understood Fla. Stat. § 553.865 targeted TGNCI people in a harmful way.

410.   As alleged above, Defendants have the authority as well as the obligation to enforce Fla. Stat. § 553.865 against Plaintiffs, and are responsible for Plaintiffs' ongoing injuries.

411.   Because Fla. Stat. § 553.865 is a pretext for this hatred, it is unconstitutional as applied to Plaintiffs and similarly situated TGNCI protest participants.

## COUNT EIGHT
## VIOLATION OF THE RIGHT TO BE FREE FROM UNEQUAL TREATMENT GUARANTEED BY THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION

*(As to Plaintiffs Wood and Kelly and Defendants Draper, Mina, Keith, Dunn, Edmonds, Smith, and Bain)*

412.   The Plaintiffs incorporate the allegations in ¶¶ 1-168, ¶¶ 173-175, ¶¶ 199-218, and ¶¶ 306-346 herein.

413.   Fla. Stat. § 553.865 violates the right of plaintiff Ms. Wood and Ms. Kelly to be free from unequal treatment as guaranteed by the Fourteenth Amendment of the U.S. constitution.

414.   Fla. Stat. § 553.865 lacks a rational, let alone a substantial or important basis for its unequal enforcement against Ms. Wood and Ms. Kelly.

415.   Because Ms. Wood and Ms. Kelly have received gender-confirmation surgery and undergone hormone replacement therapy for numerous years, they are nearly anatomically identical to every other woman in the restroom.

416.   Because Ms. Wood and Ms. Kelly have changed their name and gender marker on their driver's license, passport, and passport card, they are legally identical to every other woman in the restroom.

417.   Despite these similarities, Fla. Stat. § 553.865's definitions for "woman" and "sex" exclude Ms. Wood and Ms. Kelly.

418.   Upon information and belief, Ms. Wood and Ms. Kelly must use the women's restroom in multiple public buildings subject to Fla. Stat. § 553.865 during their two-day stay in Orlando.

419.   Upon information and belief, Ms. Wood and Ms. Kelly lack a way to exonerate themselves when authorities and private parties demand that they prove they are in the right restroom.

420.   Ms. Wood's and Ms. Kelly's government identification documents will not help because Fla. Stat. § 553.865 excludes them from the definition of woman, regardless of their legal identity in another state.

421.   Ms. Wood's and Ms. Kelly's gender-confirmation surgeries will not help because Fla. Stat. § 553.865 excludes them from the definition of woman, regardless of their anatomical similarities to other women.

422.   A cisgender woman with the same anatomy and legal status as Ms. Wood and Ms. Kelly does not have the same dilemma because Fla. Stat. § 553.865 does not exclude her from women's restrooms.

423.   The state's only basis for this difference in treatment lies in its discriminatory campaign against TGNCI people.

424.   As alleged above, Defendants have the authority as well as the obligation to enforce Fla. Stat. § 553.865 against Plaintiffs, and are responsible for Plaintiffs' ongoing injuries.

425.   Defendants' enforcement of Fla. Stat. § 553.865 is not rationally related to or supported by a legitimate state interest. Nor does it substantially advance an important governmental objective.

426.   Fla. Stat. § 553.865 lacks is unconstitutional as applied to Ms. Wood, Ms. Kelly, and other similarly situated TGNCI protest participants.

## COUNT NINE
## VIOLATION OF THE RIGHT TO BE FREE FROM PUNISHMENT UNDER A VAGUE STATUTE GUARANTEED BY THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION

*(As to all Plaintiffs and all Defendants)*

427.   The Plaintiffs incorporate the ¶¶ 1-167 ¶¶ 173-175, ¶¶ 177-244, ¶¶ 271-280, ¶¶ 282-305, and ¶¶ 306-346 herein.

428.   Fla. Stat. § 553.865 violates the right of Plaintiffs and other similarly situated TGNCI protest participants to be free from punishment under a vague statute as guaranteed by the Due Process Clause of the Fourteenth Amendment of the U.S. constitution.

429.   Fla. Stat. § 553.865 does not contain clear enforcement standards and is rife for arbitrary punishment.

430.   Law enforcement has no standard for enforcing this law short of performing random genital checks in response to a complaint or on their own

initiative.

431.   As stated above, random genital checks will not allow Ms. Wood, Ms. Kelly, and other similarly situated TGNCI protester participants to exonerate themselves because Fla. Stat. § 553.865 excludes them.

432.   Accordingly, Ms. Wood, Ms. Kelly, and other similarly situated TGNCI protester participants cannot prove their assigned-at-birth sex short of carrying a birth certificate with them in public.

433.   This is precisely the situation that allows law enforcement and residents to pursue their personal predilections.

434.   Fla. Stat. § 553.865 is also vague because an ordinary person cannot tell which additional buildings are subject to this law

435.   Absent a public records search, one cannot determine from a glance whether the government is leasing a building.

436.   Finally, one of the stated purposes for Fla. Stat. § 553.865 – "decency" – is a wholly subjective judgment that lacks a statutory definition, narrowing context, or settled legal meaning.

437.   When a statute ties "criminal culpability" to "indecent" conduct, courts have struck them down under the void-for-vagueness doctrine.

438.   As alleged above, Defendants have the authority as well as the obligation to enforce Fla. Stat. § 553.865 against Plaintiffs, and are responsible for Plaintiffs' ongoing injuries.

439.   Because Fla. Stat. § 553.865 is vague, it is unconstitutional as applied

to Plaintiffs and other similarly situated TGNCI protest participants.

## COUNT TEN
## VIOLATION OF THE FULL FAITH & CREDIT CLAUSE AS GUARANTEED BY ARTICLE IV, SECTION I OF THE U.S. CONSTITUTION

*(As to all Plaintiffs and all Defendants)*

440.   The Plaintiffs incorporate the allegations in ¶¶ 1-58, ¶¶ 65-74, ¶¶ 77-79, ¶ 131, ¶¶ 136-138, ¶¶ 177-244, ¶¶ 271-280, ¶¶ 282-305, and ¶¶ 306-346 herein.

441.   Fla. Stat. § 553.865 violates the right of Plaintiffs and other similarly situated TGNCI protest participants to have the state of Florida respect the "public acts, records, and judicial proceedings of every other state" as guaranteed by the Full Faith and Credit Clause of Article IV, Section I of the U.S. Constitution.

442.   Plaintiffs have changed their legal sex on all or some of their identity documents in their respective home states.

443.   However, as established above, these Plaintiffs and those similarly situated cannot rely on these state documents to prove they are in the correct restroom, or to avoid stigmatization and other harm perpetuated by Fla. Stat. § 553.865.

444.   Due to Fla. Stat. § 553.865, Florida does not give full faith and credit to the public records of these other states, which include California, Massachusetts, and New York.

445.   Fla. Stat. § 553.865 is unconstitutional as applied to Plaintiffs Ms. Butterfield, Ms. Kochan, Ms. Wood, and other similarly situated TGNCI protester

participants.

446.  As alleged above, Defendants have the authority as well as the obligation to enforce Fla. Stat. § 553.865 against Plaintiffs, and are responsible for Plaintiffs' ongoing injuries.

**PRAYER FOR RELIEF**

**WHEREFORE**, in light of the above facts and arguments, Plaintiffs and others similarly situated respectfully that the Court:

a.  Assume jurisdiction over this matter;

b.  Declare Fla. Stat. § 553.865 unconstitutional as applied to these Plaintiffs;

c.  Preliminarily and permanently enjoin the Defendants from enforcing the law against these Plaintiffs;

d.  Grant the Plaintiffs' cost of suit, and reasonable attorneys' fees and expenses pursuant to 28 U.S.C. § 1988; and

e.  Grant any other such relief as the Court deems appropriate.

Respectfully submitted this 29th day of September 2023.

By: /s/ Simone Chriss
Simone Chriss, Esq. (FBN 124062)
Chelsea Dunn, Esq. (FBN 1013541)
Jodi Siegel, Esq. (FBN 511617)
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, Florida 32601
(352) 271-8890
simone.chriss@southernlegal.org
chelsea.dunn@southernlegal.org
jodi.siegel@southernlegal.org

A. Chinyere Ezie, Esq.*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6467
cezie@ccrjustice.org

*Application for Special
Admission forthcoming

Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 29, 2023, I electronically served the foregoing document through the Court's CM/ECF filing system for all counsel who have filed electronic notices of appearance and by process service to parties below:

**Andrew Bain,** Orange County State Attorney's Office, 415 N. Orange Ave., Orlando, FL 32801

Osceola County State Attorney's Office, 2 Courthouse Sq. # 3500, Kissimmee, FL 34741

**Kory Keith,** Orlando City Hall, 1st Fl., 400 S. Orange Ave., Orlando, FL 32801

**Thomas W. Draper,** 4143 Salmon Dr., Orlando, FL 32835

**Eric D. Smith,** Orlando P.D., 1250 W. South St., Orlando, FL 32805

**Kevin Edmonds,** Orlando City Hall, 400 S. Orange Ave., Orlando, FL 32801

**David Dunn,** Orlando City Hall, 400 S. Orange Ave., Orlando, FL 32801 City of Orlando Fleet &

Facilities Compound, 1010 S. Westmoreland Dr., Orlando, FL 32805

**Spencer Tong,** Dr. Phillips Center for the Performing Arts, 445 S. Magnolia Ave., Orlando, FL 32801

**John W. Mina**, Orange County Sheriff's Office, 2500 W. Colonial Dr., Orlando, FL 32804

**Jared Perdue,** Florida Dep't of Transportation, 605 Suwannee St., Tallahassee, FL 32399

**John Tyler,** Florida Dep't of Transportation - District 5, 719 S. Woodland Blvd., DeLand, FL 3272

**Alex Martins**
2703 Phillips Park Ct., Winter Park, Fl. 327

By: /s/ *Simone Chriss*
Simone Chriss