## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORID
## ORLANDO DIVISION

### Case No. 6:23-cv-01887

WOMEN IN STRUGGLE, et al.,

                *Plaintiffs*,

v.

ANDREW BAIN, et al.,

                *Defendants*.

**Challenge to the Constitutionality of Florida Statute § 553.865 (2023)**

---

### PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND INCORPORATED MEMORANDUM OF LAW

### INTRODUCTION

Plaintiffs are transgender and non-binary individuals and an advocacy organization traveling to Orlando, Florida from across the country to attend the National March to Protect Trans Youth and Speakout for Trans Lives, a peaceful protest in support of transgender Floridians on October 7, 2023. Upwards of 1,000 people are anticipated to attend this historic grassroots protest. But a significant hurdle will burden the ability of Plaintiffs to exercise their speech rights during this event: Florida Statute § 553.865 (2023) (the "Bathroom Ban" or "Ban"). The Bathroom Ban prevents Plaintiffs and their members from using affirming public restrooms during their Florida travels unless they are willing to risk arrest for criminal trespass and possible fines and fees. Plaintiffs can show that this law is

patently unconstitutional as applied to them and that it will cause them immediate and irreparable injury, including chilled speech. Following electronic notice to Defendants,[1] Plaintiffs move this Court for a Temporary Restraining Order enjoining the enforcement of the Ban by Defendants without notice pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure to prevent imminent and immediate harm, or alternatively request to be heard. Plaintiffs request a decision on their Motion by Thursday, October 5, 2023, to facilitate their participation in the October 7 March.

## STATEMENT OF FACTS

Passed during a record-breaking year of transphobic and homophobic legislation nationwide, HB 1521, 2023 Leg., Reg. Sess. (Fla. 2023), codified as Florida Statute § 553.865, makes it criminal trespass to willfully enter a multi-stall restroom or changing facility "designated for the opposite sex" in K-12 buildings, post-secondary education buildings, adult prisons and juvenile detention centers, as well as any "public building," which the law defines to mean any building "owned or leased by the state, a state agency, or a political subdivision." Fla. Stat. § 553.865 (3)(j), (7)-(11). The statute reflects the viewpoint that sex is immutable from birth onward and either "female or male" based on reproductive birth anatomy and "naturally occurring sex hormones." *Id.* at (3)(l). It defines females as people "belonging, at birth, to the biological sex which has the specific

---

[1] See Declaration of A. Chinyere Ezie ¶ 2 and Ex. 14, 9/28/23 Notice to Defendants, filed herewith. All exhibits referenced herein are exhibits to the Ezie Declaration.

reproductive role of producing eggs" and males as people "belonging, at birth, to the biological sex which has the specific reproductive role of producing sperm." *Id.* at (3)(f),(h). As a result, the law bans transgender, gender nonconforming, and certain kinds of intersex people ("TGNCI people") from using affirming facilities regardless of their legal sex or their present anatomy.

The Bathroom Ban is the unmistakable outgrowth of an explicit, anti-TGNCI agenda, and it expresses the viewpoint that TGNCI people are predatory and dangerous, and that their more nuanced understandings of sex and gender are fraudulent and illegitimate. Lawmakers in the House and Senate acknowledged during hearings on the Bathroom Ban that the law targets and endangers TGNCI people without advancing public safety. *See* generally Exs. 9, 10, 12, 13.

Lawmakers, including Representative Rachel Plakon, the co-sponsor of the Ban, acknowledged that it does not contain enforcement standards or explain the evidence needed to prosecute someone, and there is a risk people will be falsely accused under the law. Ex. 13, 5/3/23 H. Sess. at 2-13. Legislators also acknowledged that they were legislating on a sensitive issue. Ex. 9, 4/10/23 H. Hr'g. at 8.

Against this backdrop, a nationwide coalition of organizations decided to organize a March and Speakout in Orlando geared at raising awareness about the plight of TGNCI youth and adults in Florida alongside other harmful state policies, and voicing opposition. Ex. 1 (WIS) ¶¶ 10-17. Plaintiff Women in Struggle is a lead organizer for the March, and as many as 1,000 people are expected to be in

attendance, including the individual Plaintiffs who are all transgender or non-binary. *Id.* at ¶¶ 11, 18; *see also* Exs. 2-6. Over the course of their Florida travels and during the March itself, Plaintiffs and their members must use public restrooms in buildings where Defendants are charged with enforcing the Statute, or else be forced to hold their urine. *See* Ex. 1 (WIS) ¶¶ 21-26; Ex. 6 (Spero) ¶¶ 11-12, 14, 24. This includes public restrooms at the Orlando International Airport, Florida Department of Transportation rest stops, the University of Central Florida, Orlando City Hall, and the Dr. Phillips Center for the Performing Arts. *See* Ex. 1 (WIS) ¶¶ 21-24; Ex. 2 (Butterfield) ¶¶ 27-30; Ex. 4 (Kelly) ¶¶ 7, 24; Ex. 5 (Fors) ¶ 5; Ex. 7 (Kochan) ¶¶ 17-19.

Defendants' enforcement of the Bathroom Ban in each of these locations is causing Plaintiffs irreparable harm—including without limitation humiliation, anxiety, worsening gender dysphoria, and an impairment of their First Amendment speech rights—and will continue to do so until enjoined. Ex. 1 (WIS) ¶¶ 27-45; Ex. 2 (Butterfield) ¶¶ 18-25; Ex. 3 (Wood) ¶¶ 20-24; Ex. 4 (Kelly) ¶¶ 23-36; Ex. 5 (Fors) ¶¶ 23-24, 27-38; Ex. 6 (Spero) ¶¶ 14-24; Ex. 7 (Kochan) ¶¶ 17-21. Accordingly, Plaintiffs seek an emergency Temporary Restraining Order ("TRO") declaring the Bathroom Ban unconstitutional as applied to them, and enjoining Defendants from enforcing it.

## ARGUMENT

**I.    Plaintiffs are Entitled to a Temporary Restraining Order (TRO) Enjoining Enforcement of the Bathroom Ban, as Applied to Them**

To obtain a Temporary Restraining Order (TRO) in the Eleventh Circuit, Plaintiffs must show: "(1) substantial likelihood of success on the merits; (2) [that] irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [plaintiff/petitioner] outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). Because all of the requirements for a TRO have been met, Plaintiffs are entitled to a TRO here.

## II.   Plaintiffs Have Standing to Sue

It is well-settled that "an actual arrest, prosecution, or other enforcement action is not a prerequisite" for lawsuits challenging the constitutionality of a statute that regulates (and criminalizes) a plaintiff's ongoing and future behavior. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). Nor is a plaintiff required to "expose himself to liability before bringing suit." *MedImmune*, 549 U.S. at 129. Instead, an injury-in-fact sufficient for individual standing can be demonstrated in a myriad of ways, including by showing that the challenged criminal provision has forced Plaintiffs to alter their behavior. *See Clements v. Fashing*, 457 U.S. 957, 962 (1982) (finding standing where plaintiffs alleged that, "but for the . . . provision they seek to challenge, they would engage in . . . acts that would trigger [] enforcement.").

Here, Plaintiffs allege that Defendants' enforcement of the Ban is forcing

them to alter their practices concerning restroom use, resign themselves to arrest, or in the case of Plaintiff Women in Struggle, divert resources away from other organizational initiatives to develop safety plans for members. *See generally* Exs. 1-6. Plaintiffs Fors and Spero assert they will forgo using public restrooms entirely and either hold their urine—despite the physical discomfort and associated health risks of UTIs—or, in the case of Fors, use non-affirming restrooms even though it is psychologically damaging. Ex. 5 (Fors) ¶ 29; Ex. 6 (Spero) ¶¶ 11-12. And Plaintiffs Butterfield, Kelly, Wood, and Kochan assert they will use the women's room in accordance with their sincerely-held views on their gender as an act of symbolic speech, even though doing so will expose them to arrest. Ex. 2 (Butterfield) ¶ 21; Ex. 3 (Wood) ¶ 23; Ex. 4 (Kelly) ¶¶ 29-34; Ex. 7 (Kochan) ¶ 17.

Physical discomfort and chilled expression from altering one's behavior are sufficient ways to establish an injury in fact. *See, e.g., Int'l Soc'y for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 819 (5th Cir. 1979) (plaintiffs have standing to bring a pre-enforcement challenge where "the allegedly unconstitutional statute interferes with the way the plaintiff would normally conduct [their] affairs."); *MedImmune*, 549 U.S. at 129 (standing exists where a plaintiff's behavior changes have been "effectively coerced"). Risking arrest for lawful expression is also a sufficient injury. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (standing to bring pre-enforcement challenges exist where plaintiffs intend to "engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute"); *Scott v.*

*Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) ("harms to speech rights for even minimal periods of time, unquestionably constitute irreparable injury supporting preliminary relief") (cleaned up).[2]

Plaintiff Women in Struggle can also demonstrate organizational injuries under theories of associational standing and direct standing. Women in Struggle can demonstrate associational standing and sue on Ms. Butterfield's behalf because she is a member of Women in Struggle who faces "realistic danger" of suffering an injury and who "would otherwise have standing to sue in [her] own right." *S. River Watershed All., Inc. v. Dekalb Cnty.*, 69 F.4th 809, 819-20 (11th Cir. 2023) (citing *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014)) (holding that environmental group had standing to sue based on an injury to one of its members, who was also an individual plaintiff in the case). Moreover, Women in Struggle is an organization dedicated to building a trans-inclusive perspective in womens' movements. Ex. 1 (WIS) ¶¶ 2-3. Therefore, the objectives of the March—raising awareness about the nationwide attacks on TGNCI people, including against transgender women—are "germane to the organization's purpose." *S. River*, 69 F.4th at 819 (citing *Arcia*, 772 F.3d at 1342). Finally, the last element for associational standing—that neither the claim nor the relief requested requires the participation of individual members—is "not normally necessary"

---

[2] Standing requirements are also relaxed in cases such as this one implicating the First Amendment. *See Speech First, Inc., v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) ("We have long emphasized that the injury requirement is most loosely applied . . . where First Amendment rights are involved.") (cleaned up).

when "the relief sought is injunctive," as it is here. *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008) (quotation omitted).

Women in Struggle can also demonstrate direct organizational standing because it is diverting resources away from longstanding advocacy initiatives, and has refocused them on educating its members about the Bathroom Ban and developing plans to ensure the safety of its TGNCI members and March participants in restrooms. Ex. 1 (WIS) ¶¶ 37-41. *See Browning*, 522 F.3d at 1166 (rejecting the state's argument that "an act or law merely causing the organization to voluntarily divert resources in response to the law . . . is not an injury cognizable under Article III."). These harms more than suffice to demonstrate the "minimal showing of injury" for direct organizational standing. *Id.* at 1165 (cost to an organization "may be slight" and need not be quantified) (quoting *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd,* 553 U.S. 181 (2008)). Moreover, there is an identical match between the diversion of their resources away from this March—and toward TGNCI people—and an "identifiable community that the organization seeks to protect"; in this case, TGNCI people. *See City of S. Miami v. Governor of Florida*, 65 F.4th 631, 638-39 (11th Cir. 2023).

All Plaintiffs can assert an imminent injury fairly traceable to Defendants because Defendants are "seriously intent" on enforcing the Ban in public restrooms. *Am. Civil Liberties Union v. Fla. Bar*, 999 F.2d 1486, 1492 (11th Cir. 1993) (quoting *Eaves*, 601 F.2d at 818). Governor DeSantis has introduced an executive policy mandating the enforcement of his slate of criminal bills—

including laws like the Ban targeting TGNCI people—and has adopted and implemented a policy of removing from office government officials who fail to pursue his agenda. *See, e.g.,* Fla. Exec. Order No. 22-176 (Aug. 4, 2022), https://www.flgov.com/wp-content/uploads/2022/08/Executive-Order-22-176.pdf; Fla. Exec Order No. 23-160 (Aug. 9, 2023), https://www.flgov.com/wp-content/uploads/2023/08/EO-23-160.pdf. Thus, even if some Defendants are sympathetic to Plaintiffs, they lack the discretion to forgo enforcement due to this executive order and policy, and Plaintiffs will experience imminent and irreparable harm traceable to their actions. *See Schultz v. Alabama*, 42 F.4th 1298, 1316 (11th Cir. 2022) (injuries were fairly traceable to defendant with enforcement authority), *cert. denied sub nom. Hester v. Gentry*, 143 S. Ct. 2610 (Mem.) (2023).

These injuries are redressible by this action because, if this Court entered an order enjoining Defendants from enforcing the statute against them, Plaintiffs could cease altering their behavior and resume engaging in protected activity without exposing themselves to arrest. *S. River*, 69 F.4th at 820 (redressability met so long as favorable court action would "significant[ly] increase . . . the likelihood" of obtaining direct redress for injuries alleged) (quotation omitted).

## III.   Plaintiffs Will Likely Prevail on the Merits of their Constitutional Challenge

Plaintiffs challenge the constitutionality of the Ban on a number of distinct bases, but need only show a substantial likelihood of success on one claim for purposes of a TRO motion. *Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d

1378, 1384 (M.D. Fla.), *aff'd*, 403 F.3d 1223 (11th Cir. 2005).

A. <u>Plaintiffs Have a Substantial Likelihood of Succeeding on the Merits of their First Amendment Claims</u>

1. The Bathroom Ban Constitutes Viewpoint Discrimination

a. *TGNCI People's Use of an Affirming Restroom is Protected Symbolic Speech that Signals a Particular Viewpoint about Sex and Gender.*

In addition to pure speech, the First Amendment protects expressive conduct and activities that are "'intended to be communicative' and, 'in context, would reasonably be understood . . . to be communicative.'" *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1598 (2022) (Alito, J., concurring) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984)); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) (recognizing the First Amendment shields expressive acts such as refusing to salute a flag, wearing an armband in protest, displaying a Communist flag, and more).

Federal courts have found that everyday activities of TGNCI people related to their gender expression are protected forms of symbolic speech, insofar as they are intended to be communicative and are understood in context. *See, e.g.*, *Monegain v. Va. Dep't of Motor Vehicles*, 491 F. Supp. 3d 117, 136 (E.D. Va. 2020) (quotation omitted) (activities include dressing and going by a particular name to reflect one's gender, where a trans woman's presentation "as a female conveyed a [protected] message of 'public concern'"); *Doe ex rel. Doe v. Yunits*, No. 001060A, 2000 WL 33162199, at *5 (Mass. Super. Ct. Oct. 11, 2000) (engaging in commonplace mannerisms to reflect that identity, such as "applying make-up in

class," may be "a further expression of gender identity"), *aff'd sub nom. Doe v. Brockton Sch. Comm.*, No. 2000-J-638, 2000 WL 33342399 (Mass. App. Ct. Nov. 30, 2000); *Kastl v. Maricopa Cnty. Cmty. Coll. Dist.*, No. Civ.02–1531PHX–SRB, 2004 WL 2008954, at *9 (D. Ariz. June 3, 2004) (a trans person's use of an affirming restroom represented protected speech because her "expression of her gender . . . ha[d] its genesis . . . in her everyday existence.").

At the root of each of these activities is the freedom to express an idea: that sex is a complex product of numerous factors, including gender identity. Ex. 2 (Butterfield) ¶¶ 18-19; Ex. 5 (Fors) ¶¶ 27-28; Ex. 6 (Spero)¶¶ 17-18. This expressive idea takes obvious hold in the context of TGNCI people's restroom use, where the state's orthodoxy around gender comes in direct conflict with Plaintiffs' desire to communicate their understanding that sex is rooted in gender identity. Plaintiffs' message is understood in the context of restrooms because *the state* categorizes restrooms according to sex. When a TGNCI person selects the facility that best captures their identity, others in the restroom understand that a TGNCI person is expressing the idea that sex includes gender identity. Ex. 4 (Kelly) ¶ 18.

> *b. The Bathroom Ban Suppresses this Perspective Because of its Message.*

The government cannot suppress protected expressive First Amendment conduct because of "its message, its ideas, its subject matter, or its content." *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1235 (N.D. Fla. 2022), *appeal filed sub nom. Pernell v. Comm'r of Fla. State Bd. of*

*Educ.*, No. 22-13992 (11th Cir. Nov. 30, 2022) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). When a regulation is "based on 'the specific motivating ideology or the opinion or perspective of [a] speaker,'" viewpoint discrimination results. *Id.* at 1236 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015)). Viewpoint discrimination is an egregious content-based restriction that allows the government to "suppress unpopular ideas or information [and] manipulate the public debate through coercion." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). Therefore, courts treat attempts at viewpoint discrimination as per se invalid. *See, e.g.*, *Speech First,* 32 F.4th at 1126 ("'viewpoint [restrictions] are prohibited,' seemingly as a *per se* matter.") (quoting *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018)); *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (viewpoint discrimination presumptively unconstitutional for even "immoral or scandalous" speech).

Taken together, the statutory provisions of the Ban discriminate against TGNCI viewpoints of sex and gender because they impose a contrary statewide "point of view" about sex: that it is fixed, consisting only of certain birth features, and unrelated to a person's gender. *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). However, during an ongoing debate on a topic of public concern, the government may not "choose[] winners and losers in the marketplace of ideas." *Speech First*, 32 F.4th at 1127; *see also Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2476 (2018) (acknowledging that gender identity is a "sensitive political topic[]").

The Ban, however, does precisely that: Plaintiffs and TGNCI people cannot

express their view of sex and identity without risking criminal charges, forgoing public restrooms, or using a restroom that invalidates their identity. Non-TGNCI people and people who believe sex is fixed and confined exclusively to reproductive birth anatomy do not have this problem. Because lawmakers have "manipulate[d] public debate" with a statute that suppresses this viewpoint under threat of criminal prosecution, the Ban impermissibly discriminates against alternative viewpoints of sex and is per se invalid. *Turner Broad. Sys*., 512 U.S. at 641; *see also, e.g*., *Speech First,* 32 F.4th at 1126 (collecting cases).

   2.  The Bathroom Ban Impermissibly Compels Expressive Speech in
       Violation of the First Amendment

When the government imposes a viewpoint, people are also forced to become the bearers of its message. But the First Amendment presumptively forbids forcing people to choose between complying with the law and sincere speech. *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2313 (2023) (forcing a person to choose between punishment and speech "'is enough,' more than enough, to represent an impermissible abridgement" of the First Amendment) (quoting *Hurley*, 515 U.S. at 574); *see also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (people have a right to "differ as to things that touch the heart of the existing order."). Indeed, the government cannot force people to embrace its "expressions of value, opinion, . . . endorsement, [or] statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573. If a person cannot "disavow" government speech that conflicts with their sincerely held beliefs, the law is

presumptively invalid. *Id.* at 576; *see also Speech First,* 32 F.4th at 1126.

A binary, immutable conception of sex lies at the heart of the Ban. Plaintiffs' sincerely held views on the nature of sex and gender defy these notions. The Ban not only suppresses Plaintiffs' ideas and symbolic speech about sex and gender, it forces Plaintiffs to bear the state's message about their gender whenever they use a public restroom, as it leaves them no way to "disavow" that message in that moment, lest they risk criminal prosecution. *See Hurley*, 515 U.S. at 573, 576; *Barnette*, 319 U.S. at 642. Because the First Amendment prohibits this compulsion, the Ban is presumptively invalid. In the alternative, it is subject to strict scrutiny, which it decidedly fails.

3. Even if the Court Strictly Scrutinizes the Bathroom Ban, the Statute is Not Narrowly Tailored to a Compelling Interest

a. *There are no compelling state interests.*

Strict scrutiny requires a court to determine whether a statute is narrowly tailored to a compelling state interest. *Speech First,* 32 F.4th at 1125-26. The Bathroom Ban's stated purpose is to provide sex-segregated spaces "to maintain public safety, decency, decorum, and privacy." Fla. Stat. § 553.865 (2). However, no evidence supports these interests. Thus, the Court should find these interests are not compelling, and that the Ban is not narrowly tailored to them.

Although public safety of children or women can be a compelling state interest, courts do not automatically accept that it animated lawmakers' decisions, or that the resulting law was narrowly tailored. *See, e.g.*, *Friends of Georges, Inc.*

*v. Mulroy*, No. 2:23-cv-02163-TLP-tmp, 2023 WL 3790583, at *27–28 (W.D. Tenn. June 2, 2023) (finding that statute designed to protect minors was not narrowly tailored). Instead, courts look for proof of the stated interest, and for appropriate fit. *See, e.g.*, *D.H. ex rel. A.H. v. Williamson Cnty. Bd. of Educ.*, 638 F. Supp. 3d 821, 833 (M.D. Tenn. 2022) (finding no evidence that transgender students were involved in over 2,000 incidences of sexual misconduct in Metro Nashville public schools between 2012 and 2016).

Here, as a number of Florida legislators openly admitted during hearings, there is no evidence whatsoever to support the notion that banning transgender people from restrooms advances public safety. Ex. 10, 4/19/23 H. Sess. at 10-12; Ex. 12, 5/3/23 S. Sess. at 2-3; Ex. 13, 5/3/23 H. Sess. at 14, 21-23. *See Janus*, 138 S. Ct. at 2465 (law is not narrowly tailored enough to survive scrutiny where there is "no evidence that the pandemonium . . . imagined would result if [the law] were not allowed"). Quite to the contrary, there is significant evidence in the legislative record that the Ban *harms* public safety by thrusting transgender people into restrooms where they do not belong based on their gender identity and expression and face an increased risk of violence, assault, and even arrest. Ex. 13, 5/3/23 H. Sess. at 2-3 (Bill sponsor acknowledging that the Ban requires transgender men to use women's restrooms, even when they have masculine features and risk being falsely accused). Accordingly, the state's purpose of public safety is not compelling.

"Decency" and "decorum" also fail as a compelling state interest because they mirror terms like "annoying" or "indecent" that are "wholly subjective

judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008) (citations omitted). Here, the terms "decency" and "decorum" are too subjective to justify a law that criminalizes a minority for the expression of their viewpoint. *Id.*; *see also United States v. Elliot*, No. 2:17-CR-33-RWS, 2018 WL 11478272, at *1–3 (N.D. Ga. Aug. 8, 2018) (terms like "disorderly" and "otherwise disturb the peace" provide no narrowing construction of what would be illegal). TGNCI people's use of an affirming restroom may be indecent or indecorous to "some people" and not to "others." *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). But ultimately, there is no way to measure this annoyance because cisgender people may not even notice when TGNCI people use the same restroom as them. Ex. 10, 5/3/23 H. Sess. at 18-19. Terms like "decency" and "decorum" cannot serve as a measure of this regulation's success because they provide no narrowing construction of their own meaning. They cannot, then, be a compelling interest to justify the Ban.

Finally, "privacy" does not provide a compelling interest to justify the Ban's application against Plaintiffs. In dicta, the Eleventh Circuit has said that "protection of individual privacy will occasionally require some segregation between the sexes." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 804 (11th Cir. 2022). However, there is no privacy right that justifies the exclusion of **all** TGNCI people from affirming public restrooms, as the Ban mandates. *See Olympus Spa v. Armstrong*, No. 22-CV-00340-BJR, 2023 WL 3818536, at *18 (W.D. Wash. June 5, 2023) (explaining that cisgender day spa

customers did not have a privacy right to exclude transgender people because there is "simply nothing private about the relationship between [the business], its employees, and the random strangers who walk in the door.").

This alleged privacy right operates on the assumption that TGNCI people have their birth genitalia or have cognizably "male" or "female" genitalia. This is not so. Plaintiffs Wood and Kelly, for instance, have received gender confirmation surgery, meaning they both have vaginas. Ex. 3 (Wood) ¶ 8; Ex. 4 (Kelly) ¶¶ 11-12. There is no logical reason Ms. Wood and Ms. Kelly must urinate in the men's room to ensure the privacy interests of other women with vaginas*, as Ms. Wood, Ms. Kelly, and these women have the same anatomy*. Yet, the Ban would require both of these women to use the *men's* restroom. This is an irrational outcome that demonstrates that privacy is not a real or compelling reason to justify the Ban, as it ultimately *forces* people with *different* genitalia to *share* the same spaces.

> b. *Even if these interests are compelling, the Bathroom Ban is not narrowly tailored to them.*

Even if the Court believes the state's interests are compelling, the Bathroom Ban is not narrowly tailored to meet them. Particularly troubling is the ban's broad geographic application—the entire state—and the lack of clear enforcement standards. *See Friends of Georges,* 2023 WL 3790583, at *28 (finding statute was not narrowly tailored because of its "novel punitive scheme," "overbroad geographical scope," "lack of affirmative defenses," and more). Because passports, birth certificates, and other state identity documents are not an accepted way to

establish one's legal sex for purposes of the statute, the law suggests nothing short of genital checks will be used as an enforcement mechanism.

Likewise, there are no exceptions to the statute for TGNCI people who legally change their sex on identity documents or for trans people who receive gender confirmation surgery, meaning the statute (1) forces them to use restrooms where they do not belong based on their gender presentation, genitalia and/or state ID, and (2) exposes them to harassment, assault, and criminal prosecution under this statute, to which no easy defense exists. Thus, the statute creates a novel criminal punishment scheme with a broad yet uncertain application. Because the Ban is not narrowly tailored to any compelling state interest and is instead a guise for discriminating against TGNCI people, it fails strict scrutiny and the Court must not apply it to Plaintiffs.

B.  Plaintiffs Have a Substantial Likelihood of Succeeding on the Merits of their Fourteenth Amendment Equal Protection Claim

Plaintiffs are also likely to prevail on their Equal Protection claim. First, the Bathroom Ban was impermissibly motivated by animus towards transgender people. Purportedly neutral laws violate the Fourteenth Amendment when they are motivated by "purposeful discrimination." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979). Here, bias towards transgender people permeated every stage of the statute's enactment. *See generally* Exs. 10-13; *United States v. Windsor*, 570 U.S. 744, 770 (2013) ("In determining whether a law is motivated by an improper animus or purpose, discriminations of an unusual character especially require

careful consideration.") (cleaned up). During hearings concerning the statute, Florida state legislators acknowledged that it "has an intended target, and that [target] is trans people." Ex. 9, 4/10/23 H. Hr'g. at 2; *accord* Ex. 10, 4/19/23 H. Sess. at 2 (legislator asking "[w]hy do we feel the need to exclude trans folks from everyday life?"). House analyses concerning the statute acknowledged its impact on transgender people, and asked whether discrimination against transgender people was "discrimination 'on the basis of sex.'" Ex. 8, 4/10/23 H. Hr'g Docs at 11. Representative Dean Black, the Ban's co-sponsor, also announced on Twitter that the law was about "prohibit[ing] biological males from using women's restrooms in public facilities," further making clear that transgender people were an intentional focus of the Ban. Ex. 11, 4/19/23 Black Tweet.

During debates, legislators also acknowledged the lack of any evidence connecting the law to public safety, as well as the fact that it harms transgender people and subjects them to considerable danger. Ex. 12, 5/3/23 S. Sess. at 2-3; Ex. 10, 4/19/23 H. Sess. at 5-7; Ex. 13, 5/3/23 H. Sess. at 14-20. As one House member acknowledged during debate, "not only are we legislating based on these myths, we're feeding into them, we're creating stereotypes. We're creating this image that trans people are dangerous, that trans people should not be in our state." Ex. 10, 4/19/23 H. Sess. at 11. Representative Barnaby also referred to transgender people as "mutants," "demons," "imps," and "evil," said he was "sick and tired" of them "parad[ing] before us," and declared "Lord rebuke you, Satan" when announcing his support for the Bathroom Ban, making clear that prejudice towards TGNCI

19

people openly motivated the passage of the bill. Ex. 9, 4/10/23 H. Hr'g. at 4-5. Because "bare . . . desire to harm a politically unpopular group cannot" justify a legislative enactment, Plaintiffs are likely to succeed on their Equal Protection claim regardless of the level of scrutiny applied. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534–35 (1973).

Moreover, even assuming that privacy and public safety—not animus—animated the passage of the Bathroom Ban, the statute still fails both intermediate scrutiny and rational basis review as applied to Plaintiffs Kelly and Wood, as the statute does not "constitute[] a rational effort to deal with these concerns." *Id.* at 536. As noted above, barring Plaintiffs Wood and Kelly from women's restrooms in public buildings when their bodies (and genitalia) are functionally indistinguishable from cisgender women as a result of gender confirmation surgery[3] does not rationally or substantially advance privacy, decency, decorum, public safety, or *any other* conceivable state interest. Instead, it irrationally treats Plaintiffs Woods and Kelly differently from similarly situated women with *similar anatomies* in violation of the Fourteenth Amendment.

C. <u>Plaintiffs Have a Substantial Likelihood of Succeeding on the Merits of their Remaining Claims[4]</u>

1. The Bathroom Ban Violates the Due Process Clause Because it Lacks Enforceable Standards

Plaintiffs also have a substantial likelihood of succeeding on their due

---

[3] *See* Ex. 3 (Wood) ¶ 8; Ex. 4 (Kelly) ¶ 11.
[4] Due to space considerations, Plaintiffs do not seek emergency relief related to Count Ten of their Complaint, alleging violations of the Full Faith and Credit Clause.

process claim because the statute is unconstitutionally vague insofar as it "authorizes or even encourages arbitrary and discriminatory enforcement." *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1319 (11th Cir. 2017) (quotation omitted). The Supreme Court has stated that the "requirement that a legislature establish minimal guidelines to govern law enforcement" is, in actuality, "the more important aspect of vagueness doctrine." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quotation omitted). Yet in the Bathroom Ban, such enforcement guidance is wholly absent. *Id.* (noting that "[w]here the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep'") (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974)). Instead, it empowers Defendants and their personnel to evict Plaintiffs and other Floridians from restrooms, and to effectuate their arrest based on gender stereotypes alone, without any proof of their so called "birth-sex." Ex. 13, 5/3/23 H. Sess. at 2-13. There is also no manner for people to avoid prosecution under the statute without genital checks, since state identity documents do not suffice.

2.  The Bathroom Ban Unconstitutionally Burdens the Right to Travel

The statute also infringes on Plaintiffs' fundamental rights under the U.S. and Florida Constitutions by impermissibly burdening interstate and intrastate travel. "The constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce in doing so . . . has been firmly established and repeatedly recognized." *United States v. Guest*, 383 U.S. 745, 757–58 (1966); *see also Catron v. City of St. Petersburg*, 658

F.3d 1260, 1270 (11th Cir. 2011) (quoting *Florida v. J.P.,* 907 So. 2d 1101, 1113 (Fla. 2004)) ("All Florida citizens have a right under the Florida Constitution to 'chat[] on a public street,' 'stroll[] aimlessly,' and 'saunter down a sidewalk.'"). Here, the Bathroom Ban impinges on a speech right of travelers, which the Supreme Court disfavors. *See, e.g.*, *Aptheker v. Sec'y of State*, 378 U.S. 500, 507-08 (1964) (striking down passport restriction burdening right to association). Because Defendants must enforce the Ban in public restrooms that Plaintiffs intend to use while traveling in Florida and exercising their speech rights, Defendants constitutionally burden the federal and state right to travel without a narrowly tailored compelling interest, let alone a rational basis.

## IV.   Plaintiffs will Suffer Irreparable Harm Absent a TRO

Plaintiffs also satisfy irreparable harm in myriad ways. First, Plaintiffs and their members have suffered and will continue to suffer irreparable harm under the law because it has coerced each of them to modify their conduct in ways that are physically and psychologically damaging, or else risk arrest. Ex. 1 (WIS) ¶¶ 28-36; Ex. 2 (Butterfield) ¶¶ 27-30; Ex. 3 (Wood) ¶ 23; Ex. 4 (Kelly) ¶¶ 29-34; Ex. 5. (Fors) ¶¶ 23-26, 29; Ex. 6 (Spero) ¶¶ 11-12; Ex. 7 (Kochan) ¶ 17.

Defendants' obligation to enforce the Ban is resulting in a number of harms to the Plaintiffs—including anxiety, hopelessness, worsening gender dysphoria, and the possibility of arrest—harms that will continue to endure so long as they remain in Florida, subject to Defendants' enforcement jurisdiction. *See, e.g.*, Ex. 1 (WIS) ¶¶ 37-40, 47-48; Ex. 2 (Butterfield), ¶¶ 21-23; Ex. 3 (Wood) ¶ 24; Ex. 4

(Kelly) ¶¶ 20-21, 26-27, 36; Ex. 5 (Fors) ¶ 34; Ex. 6 (Spero) ¶¶ 19-25. Plaintiffs and their members are also experiencing an impairment of their First Amendment rights in real time, both with regard to their ability to lawfully engage in symbolic speech, and to avoid compulsory communications of messages concerning sex and gender with which they vigorously disagree. *See, e.g.*, Ex. 1 (WIS) ¶ 30; Ex. 2 (Butterfield) ¶¶ 17-20; Ex. 3 (Wood) ¶¶ 20, 23; Ex. 4 (Kelly) ¶¶ 18, 27-28; Ex. 5 (Fors) ¶¶ 29-32; Ex. 6 (Spero) ¶¶ 18-19; Ex. 7 (Kochan) ¶¶ 12-13. The law recognizes each of these injuries as irreparable harms that money cannot redress. *See MedImmune*, 549 U.S. at 129 (injury for "coerced" behavior changes); *Scott*, 612 F.3d at 1297 ("temporary infringement of [speech] rights constitutes a serious and substantial injury.") (quotation omitted); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015) ("[e]motional distress, anxiety, depression" and "significant worsening of [plaintiff's] gender dysphoria" met standard).

## V. A TRO will Advance the Public Interest Without Harming Defendants

Plaintiffs also satisfy the third and fourth factors of the TRO standard, which merge in cases where government officials are the defendants, because the balance of equities clearly favor Plaintiffs' request for a TRO. *See Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) ("where the government is the party . . . its interest and harm"—the third and fourth elements—"merge with the public interest."). The injuries that Plaintiffs have and will continue to experience unless the statute is enjoined outweigh any conceivable harm to Defendants. *See supra* Stmt. of Facts.

Defendants cannot claim any harm at all because Plaintiffs merely seek to enjoin their enforcement of an unconstitutional statute. *See Scott*, 612 F.3d at 1297. Granting Plaintiffs' TRO motion will likewise advance (not harm) the public interest because the public has no interest in the enforcement of unjust or arbitrary laws. *Id.* The Rule 65 bond requirement should also be waived because "[p]ublic interest litigation such as the instant case is a recognized exception to the Rule 65(c) bond requirement." *Booher v. Marion Cnty.*, No. 5:07-cv-00282-WTH-GRJ, 2007 WL 9684182, at *4 (M.D. Fla. Sept. 21, 2007); *see also BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (affirming that courts in their discretion "may elect to require no security at all") (quotation omitted).

## CONCLUSION

For the foregoing reasons, Plaintiffs have satisfied all requirements for preliminary relief and respectfully request the Court issue a TRO enjoining Defendants from applying the Bathroom Ban, Fla. Stat. § 553.865, against them. Because Defendants have received due notice of this lawsuit and TRO and Plaintiffs face immediate and imminent risk of harm, no further notice or hearings are required. *See* Ezie Decl. ¶ 2; Ex. 14, 9/28/23 Notice to Defendants; Fed. R. Civ. P. 65(b)(1). However, should the Court require any further evidence in connection with this Motion, Plaintiffs respectfully request the opportunity to be heard.

Respectfully submitted this 29th day of September 2023.

By: */s/ Simone Chriss*
Simone Chriss, Esq. (FBN 124062)       Chinyere Ezie, Esq.*

Chelsea Dunn, Esq. (FBN 1013541)
Jodi Siegel, Esq. (FBN 511617)
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, Florida 32601
(352) 271-8890
simone.chriss@southernlegal.org
chelsea.dunn@southernlegal.org
jodi.siegel@southernlegal.org

Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6467
cezie@ccrjustice.org

*Application for* Special *Admission forthcoming*

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 29, 2023, I electronically served the foregoing document through the Court's CM/ECF filing system for all counsel who have filed electronic notices of appearance and by process service to parties below:

**Andrew Bain,** Orange County State Attorney's Office, 415 N. Orange Ave., Orlando, FL 32801
Osceola County State Attorney's Office, 2 Courthouse Sq. # 3500, Kissimmee, FL 34741

**Kory Keith,** Orlando City Hall, 1st Fl., 400 S. Orange Ave., Orlando, FL 32801

**Thomas W. Draper,** 4143 Salmon Dr., Orlando, FL 32835

**Eric D. Smith,** Orlando P.D., 1250 W. South St., Orlando, FL 32805

**Kevin Edmonds,** Orlando City Hall, 400 S. Orange Ave., Orlando, FL 32801

**David Dunn,** Orlando City Hall, 400 S. Orange Ave., Orlando, FL 32801
City of Orlando Fleet & Facilities Compound, 1010 S. Westmoreland Dr., Orlando, FL 32805

**Spencer Tong,** Dr. Phillips Center for the Performing Arts, 445 S. Magnolia Ave., Orlando, FL 32801

**Alex Martins** 2703 Phillips Park Ct., Winter Park, Fl 32789

**John W. Mina,** Orange County Sheriff's Office, 2500 W. Colonial Dr., Orlando, FL 32804

**Jared Perdue,** Florida Dep't of Transportation, 605 Suwannee St., Tallahassee, FL 32399

**John Tyler,** Florida Dep't of Transportation - District 5, 719 S. Woodland Blvd., DeLand, FL 32720

By: */s/ Simone Chriss*
Simone Chriss